Rose MAYBURG, et al., Plaintiffs,
Appellees,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES, Defendant,
Appellant.

No. 84–1022.

United States Court of Appeals,
First Circuit.

Argued May 9, 1984.

Decided Aug. 2, 1984.

Harold J. Krent, Atty., Appellate Staff, Civ. Div., Washington, D.C., with whom Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., William F. Weld, U.S. Atty., Boston, Mass., and Anthony J. Steinmeyer, Atty., Appellate Staff, Civ. Div., Dept. of Justice, Washington, D.C., were on brief, for defendant, appellant.

Daniel S. Manning, with whom Sally Hart Wilson, was on brief, for plaintiffs, appellees.

Before CAMPBELL, Chief Judge, BREYER, Circuit Judge, and PETTINE,* Senior District Judge.

BREYER, Circuit Judge.

With certain qualifications, the Medicare Act, Part A, provides eligible persons with 90 days of hospital "inpatient" coverage and 100 days of post-hospital "extended care" coverage during each "spell of illness." 42 U.S.C. § 1395d(a). The Act defines "spell of illness" as a period

> (1) beginning with the first day (not included in a previous spell of illness) (A) on which such individual is furnished in-

---

* Of the District of Rhode Island, sitting by desig-   nation.

patient hospital services or extended care services, and (B) which occurs in a month for which he is entitled to benefits under part A, and

(2) ending with the close of the first period of 60 consecutive days thereafter on each of which he is neither an inpatient of a hospital nor an inpatient of a skilled nursing facility.

42 U.S.C. § 1395x(a). This language seems to say that the "spell of illness" clock begins to tick when one first receives covered services; and it is not turned off and reset unless, and until, one is no longer ("an inpatient of a hospital" or) "an inpatient of a skilled nursing facility" for at least sixty days.

This case asks how this language applies to a person who *lives* in a skilled nursing facility, a very old person who receives no medical treatment at the facility, but who can no longer be kept at home. Does her "spell of illness" clock, once started, *never* turn off? Once she uses up the full treatment allowance offered for a single "spell of illness" (and a lifetime reserve), is she out of luck? The Department of Health and Human Services ("HHS") believes so. It has long interpreted the words "inpatient of a skilled nursing facility" to include one who receives only "custodial" care in the facility, *i.e.*, one who simply lives there. And HHS believes that such people consequently cannot reset the "spell of illness" clock.

The plaintiff in this case, Rose Mayburg, is an 88 year old woman who lives in a "skilled nursing facility" but who receives only "custodial" care. Medicare Part A does not reimburse the cost of this custodial care. But Medicare Part A does pay for any hospital (and related) treatment. Since April 1977 she has been admitted to a hospital at least four times, sometimes for fever and sometimes because of rectal bleeding. In each instance she returned to the nursing facility where she lives. Blue Cross told her that Medicare Part A would not cover her after March 4, 1980, for she had used up the benefits pertaining to one "spell of illness;" and she had elected not to use her special lifetime allowance; since she lives in a nursing home, her "spell of illness" clock could not be reset. She appealed this decision through HHS and finally to the district court.

The district court found that HHS erroneously interpreted the statute. The words "inpatient of a skilled nursing facility" do not apply to one who receives only custodial care at a skilled nursing facility. Thus, such a person's "spell of illness" clock turns off (after sixty days of no treatment) and begins to run again. 574 F.Supp. 922. HHS appeals this holding. After considering the arguments and reading the legislative history of the statute, we conclude that the district court is correct.

I

We can state our reasons for agreeing with the district court briefly. First, the court's decision is consistent with the overwhelming weight of judicial authority. Three separate circuits, the Second, Third, and Sixth, as well as many district courts, have rejected the Secretary's interpretation of the statute. *Levi v. Heckler,* 736 F.2d 848 (2d Cir.1984) (per curiam); *Kaufman v. Harris,* 731 F.2d 370 (6th Cir.1984) (per curiam); *Friedberg v. Schweiker,* 721 F.2d 445 (3rd Cir.1983); *Henningson v. Heckler,* Slip Op. No. 83–3077 (N.D.Iowa Oct. 27, 1983); *Steinberg v. Schweiker,* 549 F.Supp. 114 (S.D.N.Y.1982); *Estate of Picard v. Secretary of Health and Human Services,* [1980–1981 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 30,722 (S.D.N.Y. Sept. 2, 1980); *Levine v. Secretary of Health, Education and Welfare,* 529 F.Supp. 333 (W.D.N.Y.1981); *Burt v. Secretary of Health, Education and Welfare,* No. S–77–619 (E.D.Cal. Feb. 22, 1979); *Eisman v. Mathews,* 428 F.Supp. 877 (D.Md. 1977); *Gerstman v. Secretary of Health, Education and Welfare,* 432 F.Supp. 636 (W.D.N.Y.1977); *Hasek v. Mathews,* [1977–1978 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 28,345 (N.D.Cal. Feb. 8, 1977); *Hardy v. Mathews,* [1976–1977 Transfer Binder] Medicare & Medicaid

Guide (CCH) ¶ 28,031 (D.Minn. July 28, 1976). Only two district courts have upheld the Secretary, and neither of their opinions analyzes the issue in much detail. *Stoner v. Califano*, 458 F.Supp. 781 (E.D. Mich.1978); *Brown v. Richardson*, 367 F.Supp. 377 (W.D.Pa.1973).

Second, the court's decision adopts the meaning that the plain language of the statute suggests. The word "patient" ordinarily refers to one who receives treatment. Webster defines an "inpatient" as "a patient ... who receives lodging and food as well as treatment." Webster's Third New International Dictionary 1167 (1976 unabridged). One like Mrs. Mayburg, who receives only custodial care, receives "lodging and food" but not "treatment." Hence, ordinary English usage places her outside the scope of the term "inpatient."

Third, the Secretary's interpretation creates a curious anomaly. Had Mrs. Mayburg lived at home, sixty days after she was released from the hospital (and after any "extended care" was no longer necessary), her "spell of illness" would have terminated and the clock would have been reset. Because she lived in a nursing home, the Secretary believes the "spell" does not terminate. Yet, there is no *medical* difference between the actual Mrs. Mayburg who lives in the nursing home and the hypothetical Mrs. Mayburg who lives at home. Why should the place of residence then create a difference in result?

Fourth, the administrative and technical arguments that the Secretary advances in favor of a more technical meaning for "inpatient" are weak. The Secretary points out that administratively it is easier to determine (1) whether a person is living in a nursing home than to determine (2) whether a person living in a nursing home is receiving only custodial care or treatment as well. But, the force of this administrative argument is weakened by the fact that the Secretary typically must determine treatment levels anyway—to decide, for example, when a "spell of illness" begins or

whether expenses are to be reimbursed. The Secretary also points to the use of "inpatient" in two neighboring sections of the Act, defining "extended care services," 42 U.S.C. § 1395x(h) and "skilled nursing facility," 42 U.S.C. § 1395x(j). But the Secretary does not demonstrate any significant administrative or interpretive problem that would arise if the word "inpatient" in those sections, as well as in the "spell of illness" section, were interpreted to refer to a resident who receives some form of treatment. (*See* Appendix A for text.) Juxtaposing these sections reveals no linguistic anomaly sufficient to justify the practical anomaly to which the Secretary's interpretation leads.

■ Fifth, the district court's position is consistent with the general principle that the Social Security Act should be broadly construed, so as to carry out Congress's intent to provide medical expense coverage for all qualifying individuals. *Rodriguez v. Celebrezze*, 349 F.2d 494, 496 (1st Cir.1965); *Rowe v. Finch*, 427 F.2d 417, 419 (4th Cir. 1970).

## II

The Secretary makes two sets of arguments in favor of her interpretation that warrant further discussion.

a. She claims that the legislative history of the statute supports her interpretation of the word "inpatient," to include all who live at a skilled nursing facility. We have read the history, however, and have not found significant support for her interpretation.

Congress enacted the statutory provision in 1965. The parties have found nothing in the legislative history of that 1965 statute that is on point. The 1965 history suggests, at most, that Congress did not intend to finance longterm hospital stays; but, any such intent is consistent with either "inpatient" definition.

For the most part the legislative history that the Secretary cites developed two years later in 1967 when Congress considered *amending* the statute. The Presi-

dent of Blue Cross then testified, for example, that

> present law does not authorize any distinction between a beneficiary who is receiving skilled nursing care and other services in an extended care facility and one who [simply] resides in a nursing home.... Once the resident who is domiciled in such a nursing home has used up his presently authorized ... days of extended-care facility benefits, he cannot start a new spell of illness and become entitled to further care [unless he changes his residence] ....

Proposed amendment to the Social Security Act: Hearings before the Senate Comm. on Finance, 90th Cong. 1st Sess. 915, 919 (1967). And, other witnesses testified similarly. *Id.* at 920, 924 (statement of Walter McNerney, President, Blue Cross Association); *id.* at 1023, 1027 (statement of Garland Bonin, Commissioner of the Louisiana Dept. of Public Welfare); *id.* at 1028 (colloquy between Senator Curtis and Mr. Roberts, Blue Cross Welfare Services Director); *id.* at 1836, 1840–41 (statement of Ed Walker, President, American Nursing Home Association); *The President's Proposals for Revision of the Social Security System,* Hearings before the House Comm. on Ways and Means, 90th Cong., 1st Sess. 1003, 1006–07 (statement of Thomas Jenkins, President, American Association of Homes for the Aging); *id.* at 2308, 81 (letter to Rep. Wilbur D. Mills from Greater Miami Jewish Federation).

This history is beside the point, however, for by 1967 HHS had made its position clear. It had interpreted the 1965 statute to reach the result that these witnesses opposed. It is no wonder then that they described present law in those terms and asked for legislative relief. Their description does not demonstrate that HHS had *correctly* interpreted the 1965 statute.

At most, their descriptions, their effort to obtain legislation, and Congress's failure to amend, suggests a congressional "acquiescence" in the HHS interpretation. This "acquiescence" is arguably also evidenced by the fact that a House of Representatives Report, written in 1967, came close to adopting HHS's description of present law. In explaining Congress' decision to extend the number of days of treatment that would be covered, the Report states:

> The proposed increase in the number of days of inpatient hospital benefits is intended to help meet the problem faced by a beneficiary who requires long-term care in an extended care facility and whose spell of illness continues throughout his stay in the facility because he has not been out of a hospital or any institution that is primarily engaged in providing skilled nursing care and related services for 60 consecutive days.

H.R.Rep. No. 207, 90th Cong., 1st Sess. 44 (1967); *accord* S.Rep. No. 744, 90th Cong., 1st Sess. 70 (1967), U.S.Code Cong. & Admin.News 1967, p. 2834. The Secretary points out that Congress could then have overturned the HHS interpretation legislatively, but it did not do so.

■ It is a mistake, however, to equate a congressional failure to act with congressional action. Congress has neither the time nor the inclination to correct every administrative misinterpretation of a prior statute. Moreover, given the many stages through which a bill must pass before emerging from Congress, it is typically easier to halt legislation than to enact it. And, varying potential impacts of proposed laws among varying groups can create complex sets of reasons behind opposition to a legislative proposal. This is to say that failure to pass a "revising amendment" does not automatically show that any member of Congress ever thought that an existing administrative interpretation of present law was desirable or correct, much less that Congress intended to "underwrite" it. Although "acquiescence" is entitled to some weight in interpreting a statute, that weight cannot be conclusive. *See SEC v. Sloan,* 436 U.S. 103, 119–23, 98 S.Ct. 1702, 1712–14, 56 L.Ed.2d 148 (1977). And, where acquiescence has been deemed significant, there is typically far more evidence of congressional intent than that which is present here. *Compare Bob*

*Jones University v. United States,* 461 U.S. 574, ——–——, 103 S.Ct. 2017, 2032–34, 76 L.Ed.2d 157 (1983) (finding acquiescence) *with Aaron v. SEC,* 446 U.S. 680, 694 n. 11, 100 S.Ct. 1945, 1954 n. 11, 64 L.Ed.2d 611 (1980) (finding no acquiescence) and *SEC v. Sloan,* 436 U.S. at 119–23, 98 S.Ct. at 1712–14 (same). The legislative history does not lead us to change our conclusion.

b. The Secretary also argues that this court should simply defer to HHS's interpretation of the statute. She points to a line of Supreme Court cases that, she argues, compel such deference. *See, e.g., FEC v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 39, 102 S.Ct. 38, 45–6, 70 L.Ed.2d 23 (1981) (inquiry is "whether the Commission's construction was 'sufficiently reasonable' to be accepted by a reviewing court"); *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565, 100 S.Ct. 790, 796, 63 L.Ed.2d 22 (1980) (Federal Reserve Board's interpretation of its statute will control unless "demonstrably irrational"); *Ford Motor Co. v. NLRB,* 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979) (if Labor Board's construction of its statute is "reasonably defensible," it should not be rejected); *Red Lion Broadcasting Co., Inc. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969) (agency's construction should be followed "unless there are compelling indications that it is wrong"). *See also Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). A different line of Supreme Court cases, however, cautions us that "deference" is not complete; sometimes a different, and more independent judicial attitude is appropriate. *Bureau of Alcohol, Tobacco & Firearms v. Federal Labor Relations Authority,* — U.S. ——, ——, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983) (court reviewing agency interpretation of law should not "slip into judicial inertia" or "rubberstamp" the agency); *American Ship Building Co. v. NLRB,* 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1964) (deference owed to agency "cannot be allowed to slip into a judicial inertia"); *NLRB v. Brown Food Store,* 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1964) (reviewing courts "are not obliged to stand aside and rubber stamp" the agency); *NLRB v. Insurance Agents' International Union,* 361 U.S. 477, 499–500, 80 S.Ct. 419, 432–33, 4 L.Ed.2d 454 (1960) (recognition of administrative power "cannot exclude all judicial review" of agency's actions); *see also NLRB v. Highland Park Manufacturing Co.,* 341 U.S. 322, 325–26, 71 S.Ct. 758, 760–61, 95 L.Ed. 969 (1951); *Davies Warehouse Co. v. Bowles,* 321 U.S. 144, 156, 64 S.Ct. 474, 481, 88 L.Ed. 635 (1944). Moreover, the Administrative Procedure Act states that "the reviewing court," not the agency, "shall decide all relevant questions of law." 5 U.S.C. § 706.

In order to apply correctly what Judge Friendly has described as conflicting authority, (*see Pittston Stevedoring Corp. v. Dellaventura,* 544 F.2d 35, 49 (2d Cir. 1976); *see also* 4 K. Davis, *Administrative Law Treatise* § 30.1 (1958 & 1982 Supp.)), we must ask *why* courts should ever defer, or give special weight, to an agency's interpretation of a statute's meaning. And, here there are at least two types of answers, neither of which supports more than a modicum of special attention here.

First, one might argue that specialized agencies, at least sometimes, know better than the courts what Congress actually intended the words of the statute to mean. Thus, in *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), the Supreme Court wrote

We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which

give it power to persuade, if lacking power to control.

*Id.* at 140, 65 S.Ct. at 164. The fact that a question is closely related to an agency's area of expertise may give an agency greater "power to persuade." Its interpretation may also carry more persuasive power if made near the time the statute was enacted when congressional debates and interest group positions were fresh in the administrators' minds. *Norwegian Nitrogen Products Co. v. United States*, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933). An interpretation that has proved to be administratively workable because it is consistent and longstanding is typically more persuasive, *Massachusetts Trustees of Eastern Gas & Fuel Associates v. United States*, 377 U.S. 235, 241, 84 S.Ct. 1236, 12 L.Ed.2d 268 (1964), as is an interpretation that has stood throughout subsequent reenactment of the statute, *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974). *See* 2 K. Davis, *Administrative Law Treatise* § 7:14 (1979). All these factors help to convince a court that the agency is familiar with the context, implications, history and consequent meaning of the statute. But, still, under *Skidmore* the agency ultimately must depend upon the *persuasive power* of its argument. The simple fact that the agency *has* a position, in and of itself, is of only marginal significance.

In the case before us, the fact that the agency's interpretation is consistent, longstanding, and left untouched by Congress all count in its favor. Nonetheless, HHS points to no significantly adverse administrative consequences that might flow from the contrary interpretation. Under these circumstances, the considerations mentioned in Part I are simply more persuasive. They convince us, as they have convinced other courts, that in this instance, HHS has not interpreted the statute as Congress meant.

Second, a court might give special weight to an agency's interpretation of a statute because Congress intended it to do just that in respect to the statute in question. In *Social Security Board v. Nierotko*, 327 U.S. 358, 66 S.Ct. 637, 90 L.Ed. 718 (1946), for example, the Court noted that an agency, "when it interprets a statute" may act "as a delegate to the legislative power." And the Court added that "such interpretive power may be included in the agencies' administrative functions." *Id.* at 369, 66 S.Ct. at 643. If Congress *expressly* delegates a law-declaring function to the agency, of course, courts must respect that delegation. *Schweiker v. Gray Panthers*, 453 U.S. 34, 44, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981); *Batterton v. Francis*, 432 U.S. 416, 424–26, 97 S.Ct. 2399, 2404–06, 53 L.Ed.2d 448 (1977); 2 K. Davis, *supra* at § 7:8 (1979). But, if Congress is silent, courts may still infer from the particular statutory circumstances an *implicit* congressional instruction about the degree of respect or deference they owe the agency on a question of law. *See Chevron v. Natural Resources Defense Council, Inc.*, —— U.S. ——, ——, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (U.S.1984). They might do so by asking what a sensible legislator would have expected given the statutory circumstances. The less important the question of law, the more interstitial its character, the more closely related to the everyday administration of the statute and to the agency's (rather than the court's) administrative or substantive expertise, the less likely it is that Congress (would have) "wished" or "expected" the courts to remain indifferent to the agency's views. *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808 (1979); *Constance v. Secretary of Health and Human Services*, 672 F.2d 990, 995–96 (1st Cir. 1982); L. Jaffe, *Judicial Control of Administrative Action* 560–64 (1965). Conversely, the larger the question, the more its answer is likely to clarify or stabilize a broad area of law, the more likely Congress intended the courts to decide the question themselves. *Compare NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944) *with Pack-*

*ard Motor Car Co. v. NLRB,* 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947).

In this instance, the "spell of illness" provision is central to the statutory scheme. The interpretive skills called for seem primarily judicial, not administrative, in nature. The "administrative" implications seem trifling, or non-existent. And, nothing else suggests any specific congressional intent to place the power to construe this statutory term primarily in the agency's hands. Thus, the arguments for completely deferring to the agency's interpretation of the statute are not strong here.

In sum, we have paid particular attention to HHS's arguments; we have taken note of its experience administering the statute and of its administrative needs; we have reached our decision with all those factors in mind. Having done so, we nonetheless believe, for the reasons stated in Part I, that the agency's interpretation of the statute is incorrect.

### III

Believing that the Secretary was pursuing a policy of "nonacquiescence" under which she would refuse either to appeal or to apply (except in the particular case) adverse judicial decisions, Mayburg asked the district court to certify her suit as a class action on behalf of all Medicare recipients in her administrative region who had been or would be denied benefits because of the Secretary's interpretation. The district court agreed to certify the class because the Secretary had "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole ...." Fed.R.Civ.P. 23(b)(2). It defined the class as

all persons residing in Region I of the Department of Health and Human Services who, having presented claims for Medicare Part A benefits, have been or will be denied such benefits based on a determination that they have had a single "spell of illness" which continued while they resided in a skilled nursing home, even though they were receiving custodial rather than skilled nursing care.

The effect of the certification was simply to require the Secretary to apply the court's interpretation of the statute in all similar cases. The Secretary argues that the district court did not have jurisdiction over *all* members of this class; in particular, it lacked jurisdiction over claims of those persons who had not yet exhausted their administrative remedies and of claims amounting to less than $1,000. The district court believed that it had jurisdiction over all such claims under either the judicial review provision of the Medicare Act, 42 U.S.C. § 1395ff(b) (incorporating 42 U.S.C. § 405(g)), or the Mandamus and Venue Act, 28 U.S.C. § 1361.

At oral argument, counsel for the Secretary undercut the premise upon which the class was certified, for in response to questions about "non-acquiescence" he stated the following:

The Secretary has followed the district court order in this case. She has every intention of doing so if she loses on appeal as well. In addition, in the Third Circuit case which we lost, she has begun to implement the content of the adverse order of the Third Circuit Court of Appeals. There is no reason to think that she will not [sic] do otherwise in this case and I've been told that from everything that they can tell so far they intend to follow an adverse decision by this court, unless, of course, they seek certiorari.

In context, it is apparent that the government wanted to say either that "[t]here is no reason to think that she will ... do otherwise" or "[t]here is no reason to think that she will not do [the same]." (The Secretary should inform us if that is not so). And, as so read, we take this statement as an abandonment of any policy of "non-acquiescence" in this circuit. For this reason we see no need to explore the difficult jurisdictional questions that this case raises.

Both sides agree that mandamus is appropriate only when no other adequate

remedy is available. *Cervoni v. Secretary of Health, Education and Welfare,* 581 F.2d 1010, 1019 (1st Cir.1978); *see United States ex rel Girard Trust Co. v. Helvering,* 301 U.S. 540, 544, 57 S.Ct. 855, 857, 81 L.Ed. 1272 (1937). The Secretary's statement means that other adequate remedies exist for all members of the class who might be affected by today's decision. Each member can simply invoke ordinary administrative procedures, for the Secretary intends to follow our interpretation of the "spell of illness" provisions, subject only to the minor qualifications contained in the quoted dialogue. Thus, mandamus jurisdiction does not extend to any of the claims of this case.

■■■ Without mandamus jurisdiction, the court's authority to consider claims is controlled by 42 U.S.C. § 1395ff (incorporating 42 U.S.C. § 405(g)). This section expressly denies judicial review "to an individual ... if the amount in controversy is less than $1,000." 42 U.S.C. § 1395ff(b)(2). Section 405(g), which § 1395ff(b)(1) incorporates, further limits judicial review to "final decision[s] of the Secretary ...." 42 U.S.C. § 405(g). At a minimum these words require that the Secretary take a final position on a contested matter. *Heckler v. Ringer,* — U.S. —, —, 104 S.Ct. 2013, 2021–25, 80 L.Ed.2d 622 (U.S.1984); *Mathews v. Eldridge,* 424 U.S. 319, 328, 96 S.Ct. 893, 899, 47 L.Ed.2d 18 (1976). The Secretary's agreement to follow this court's decision means that she has taken no final position adverse to future claimants who will present the "spell of illness" question. Thus, under the circumstances, we conclude that the class should not extend to future claimants or those whose claims are for less than $1,000.

■■ As a final matter, the Secretary argues that, as a matter of comity, we should narrow the class to exclude beneficiaries living in Vermont and Connecticut. These states, although part of Region I of the Department of Health and Human Services, lie in the Second Circuit. Since the Second Circuit has recently interpreted the "spell of illness" provision the same way we have, *Levi v. Heckler, supra,* we see no need to narrow the class in this respect.

In sum, the class should consist only of those persons denied benefits of more than $1,000 on the basis of a final determination that they have had a single "spell of illness" which continued while "they resided in a skilled nursing facility, even though they were receiving custodial rather than skilled nursing care."

The judgment of the district court is

*Affirmed in part, and vacated and remanded in part for further proceedings consistent with this opinion.*

## APPENDIX A

*42 U.S.C. Section 1395x(a):*

### (a) Spell of illness

The term "spell of illness" with respect to any individual means a period of consecutive days—

(1) beginning with the first day (not included in a previous spell of illness) (A) on which such individual is furnished inpatient hospital services or extended care services, and (B) which occurs in a month for which he is entitled to benefits under part A, and

(2) ending with the close of the first period of 60 consecutive days thereafter on each of which he is neither an inpatient of a hospital nor an inpatient of a skilled nursing facility.

*42 U.S.C. Section 1395x(h):*

### (h) Extended care services

The term "extended care services" means the following items and services furnished to an inpatient of a skilled nursing facility and (except as provided in paragraphs (3) and (6)) by such skilled nursing facility—

(1) nursing care provided by or under the supervision of a registered professional nurse;

(2) bed and board in connection with the furnishing of such nursing care;

(3) physical, occupational, or speech therapy furnished by the skilled nursing facility or by others under arrangements with them made by the facility;

(4) medical social services;

(5) such drugs, biologicals, supplies, appliances, and equipment, furnished for use in the skilled nursing facility, as are ordinarily furnished by such facility for the care and treatment of inpatients;

(6) medical services provided by an intern or resident-in-training of a hospital with which the facility has in effect a transfer agreement (meeting the requirements of subsection (*l*) of this section), under a teaching program of such hospital approved as provided in the last sentence of subsection (b) of this section, and other diagnostic or therapeutic services provided by a hospital with which the facility has such an agreement in effect; and

(7) such other services necessary to the health of the patients as are generally provided by skilled nursing facilities;

excluding, however, any item or service if it would not be included under subsection (b) of this section if furnished to an inpatient of a hospital.

*42 U.S.C. Section 1395x(j):*

### (j) Skilled nursing facility

The term "skilled nursing facility" means (except for purposes of subsection (a)(2) of this section) an institution (or a distinct part of an institution) which has in effect a transfer agreement (meeting the requirements of subsection (*l*) of this section) with one or more hospitals having agreements in effect under section 1395cc of this title and which—

(1) is primarily engaged in providing to inpatients (A) skilled nursing care and related services for patients who require medical or nursing care, or (B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons;

(2) has policies, which are developed with the advice of (and with provision of [1] review of such policies from time to time by) a group of professional personnel, including one or more physicians and one or more registered professional nurses, to govern the skilled nursing care and related medical or other services it provides;

(3) has a physician, a registered professional nurse, or a medical staff responsible for the execution of such policies;

(4)(A) has a requirement that the health care of every patient must be under the supervision of a physician, and (B) provides for having a physician available to furnish necessary medical care in case of emergency;

(5) maintains clinical records on all patients;

(6) provides 24-hour nursing service which is sufficient to meet nursing needs in accordance with the policies developed as provided in paragraph (2), and has at least one registered professional nurse employed full time;

(7) provides appropriate methods and procedures for the dispensing and administering of drugs and biologicals;

(8) has in effect a utilization review plan which meets the requirements of subsection (k) of this section;

(9) in the case of an institution in any State in which State or applicable local law provides for the licensing of institutions of this nature, (A) is licensed pursuant to such law, or (B) is approved, by the agency of such State or locality responsible for licensing institutions of this nature, as meeting the standards established for such licensing;

(10) has in effect an overall plan and budget that meets the requirements of subsection (z) of this section;

**(11)** complies with the requirements of section 1320a–3 of this title;

**(12)** cooperates in an effective program which provides for a regular program of independent medical evaluation and audit of the patients in the facility to the extent required by the programs in which the facility participates (including medical evaluation of each patient's need for skilled nursing facility care);

**(13)** meets such provisions of such edition (as is specified by the Secretary in regulations) of the Life Safety Code of the National Fire Protection Association as are applicable to nursing homes; except that the Secretary may waive, for such periods as he deems appropriate, specific provisions of such Code which if rigidly applied would result in unreasonable hardship upon a nursing home, but only if such waiver will not adversely affect the health and safety of the patients; except that the provisions of such Code shall not apply in any State if the Secretary finds that in such State there is in effect a fire and safety code, imposed by State law, which adequately protects patients in nursing facilities;

**(14)** establishes and maintains a system that (A) assures a full and complete accounting of its patients' personal funds, and (B) includes the use of such separate account for such funds as will preclude any commingling of such funds with facility funds or with the funds of any person other than another such patient; and

**(15)** meets such other conditions relating to the health and safety of individuals who are furnished services in such institution or relating to the physical facilities thereof as the Secretary may find necessary (subject to the second sentence of section 1395z of this title), except that the Secretary shall not require as a condition of participation that medical social services be furnished in any such institution. Notwithstanding any other provision of law, all information concerning skilled nursing facilities required by this subsection to be filed with the Secretary shall be made available to Federal or State employees for purposes consistent with the effective administration of programs established under subchapters XVIII and XIX of this chapter; except that such term shall not (other than for purposes of subsection (a)(2) of this section) include any institution which is primarily for the care and treatment of mental diseases or tuberculosis. For purposes of subsection (a)(2) of this section, such term includes any institution which meets the requirements of paragraph (1) of this subsection. The term "skilled nursing facility" also includes an institution described in paragraph (1) of subsection (y) of this section, to the extent and subject to the limitations provided in such subsection. To the extent that paragraph (6) of this subsection may be deemed to require that any skilled nursing facility engage the services of a registered professional nurse for more than 40 hours a week, the Secretary is authorized to waive such requirement if he finds that—

**(A)** such facility is located in a rural area and the supply of skilled nursing facility services in such area is not sufficient to meet the needs of individuals residing therein,

**(B)** such facility has one full-time registered professional nurse who is regularly on duty at such facility 40 hours a week, and

**(C)** such facility (i) has only patients whose physicians have indicated (through physicians' orders or admission notes) that each such patient does not require the services of a registered nurse or a physician for a 48-hour period, or (ii) has made arrangements for a registered professional nurse or a phy-

sician to spend such time at such facility as may be indicated as necessary by the physician to provide necessary skilled nursing services on days when the regular full-time registered professional nurse is not on duty.