**COMITE PRO RESCATE DE LA SALUD, etc., et al., Plaintiffs, Appellants,**

v.

**PUERTO RICO AQUEDUCT AND SEWER AUTHORITY, etc., et al., Defendants, Appellees.**

No. 89–1091.

United States Court of Appeals, First Circuit.

Heard June 8, 1989.

Decided Oct. 26, 1989.

Anthony Z. Roisman with whom Ann C. Yahner, Cohen, Milstein & Hausfeld, Washington, D.C., Michael E. Withey, Leonard W. Schroeter, Schroeter, Goldmark & Bender, Seattle, Wash., and Pedro J. Varela, Hato Rey, P.R., were on brief, for appellants.

Donald A. Carr, Acting Asst. Atty. Gen., Randolph L. Hill, Office of General Counsel, Environmental Protection Agency, Susan B. Squires and Anne S. Almy, Land & Natural Resources Div., Dept. of Justice, Washington, D.C., on brief, for U.S., amicus curiae.

Robert E. Zahler with whom Michael L. Stern, Margaret B. Bowman, Shaw, Pittman, Potts & Trowbridge, Washington, D.C., Francisco G. Bruno, Sweeting, Gonzalez & Cestero, Hato Rey, P.R., Geoffrey Stewart, Hale & Dorr, Washington, D.C., Pedro A. Morell, Brown, Newsom & Cordova, Hato Rey, P.R., Dwight C. Seeley, Edward J. Burns, John L. Greenthal, Nixon, Hargrave, Devans & Doyle, Albany, N.Y., Jose A. Cestero, Hato Rey, P.R., Andreu Garcia Law Offices, Zaidee Acevedo, Steven C. Lausell, Jimenez, Graffam & Lausell, San Juan, P.R., Enrique Alcaraz Micheli, Ferrer & Alcaraz, Laurie S. Gill, Palmer & Dodge, Boston, Mass., Encarnita Catalan Marchan, Santiago Mari Roca and Ribas, Biaggi & Mari, Irwin H. Flashman, Zadette Bajandas and O'Neill & Borges, Hato Rey, P.R., were on brief, for appellees The Perkin–Elmer Corp. and Perkin Elmer Caribbean Corp., Storage Technology Corp. and Storage Technology de Puerto Rico, Puerto Rico Indus. Development Co., Bristol Myers Co., Bristol Caribbean, Inc. and Bristol Laboratories Corp., Mayaguez Air Conditioning and Syncor Indus. Corp., Puerto Rico Aqueduct and Sewer Authority and Sea Electronics Aids, Inc., Westinghouse De Puerto Rico, Inc. and Westinghouse Electric Corp.

John C. Chambers, Jr., Richard A. Flye, Susan Kunst, Boushell, McKenna, Conner & Cuneo, Washington, D.C., and Bruce Adler, on brief for Union Carbide Corp., amicus curiae.

* Of the District of Massachusetts, sitting by desig-

Gerard Lederer, General Counsel, on brief for U.S. Conference of Mayors, amicus curiae.

Before BREYER and SELYA, Circuit Judges, and CAFFREY,* Senior District Judge.

BREYER, Circuit Judge.

This appeal concerns the meaning of an exception in the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*, a statute that regulates the disposal of solid wastes. The Act, among other things, permits both the federal government and private citizens to ask a court for injunctive relief against any person connected with the handling, storage, treatment, or disposal of

> any solid waste or hazardous waste [which] may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6973(a) (authorizing administrator to bring suit); *see* 42 U.S.C. § 6972(a)(1)(B) (authorizing citizens' suits to enforce "imminent and substantial endangerment" provision) (see Statutory Appendix). But, the Act specifies that these wastes do "not include solid or dissolved material *in domestic sewage.*" 42 U.S.C. § 6903(27) (emphasis added). Do the words "in domestic sewage" refer to the *kinds* of sewage that ordinarily emanate from houses—sewage that EPA calls "untreated sanitary wastes?" *See* 40 C.F.R. § 261.4(a)(1)(ii). If so, the exception may include factory wastes that mix with this kind of "sanitary" sewage, say, sewage emanating from bathrooms at the workplace, and the exception is then quite broad. Or do the words "in domestic sewage" refer, as well, to the point of origin of the sewage? Do they mean that the wastes must, in fact, come from houses? If so, the exception is narrow, for it does not embrace solid industrial material mixed with sewage coming from workplace bathrooms.

We conclude that the narrower reading of the exception—the reading that refers to

nation.

point of origin—is the correct reading. Consequently, the plaintiffs in this case may proceed in their efforts to prove that RCRA entitles them to injunctive relief. *See* 42 U.S.C. § 6972.

## I.

### *Background*

The defendants in this case own factories within (or are otherwise connected with) a large industrial park near Mayaguez, Puerto Rico (the "Park"). The Park contains 33 industrial plants. Sewer lines connect the plants to a major, privately owned sewer line; that major private line, in turn, connects with a publicly owned sewer line that runs outside the Park to a publicly owned sewage treatment plant (called, in environmental jargon, a POTW, or publicly owned treatment work). At the time the plaintiffs brought this suit, both the major, private line and the publicly owned line contained *only* wastes from the industrial park; they did not connect with lines running from any private houses. *See Comite pro Rescate de la Salud v. PRASA,* 693 F.Supp. 1324, 1330 n. 11 (D.P.R.1988). There is also a second, different sewer system within in the Park, which collects rainwater and dumps it into a nearby river; we shall call this second system the "rainwater system."

The plaintiffs (a group of seven individuals and a community organization called, in English, the Committee to Rescue Health) brought this lawsuit claiming that the defendants, in disposing of their industrial wastes, violated several different environmental laws. They said, for one thing, that quite a few of the defendants violated the Clean Water Act by dumping industrial wastes into the rainwater system, thereby discharging those wastes into the river without necessary permits. 33 U.S.C. § 1311. They said, for another thing, that various defendants violated the Clean Air Act by discharging certain noxious fumes, through chimneys and flues, into the outer air. 42 U.S.C. §§ 7411, 7412, 7475. They added that various defendants violated the basic regulatory provisions of RCRA by discharging certain solid, hazardous wastes through their regular sewer system with-

out keeping proper records or obtaining necessary permits. 42 U.S.C. §§ 6921–6934. Finally, and particularly important in terms of this appeal, they claimed that the regular sewer lines were leaking, emitting fumes and other substances that posed an "imminent and substantial endangerment" to health and the environment, to stop which they sought an injunction under RCRA's "citizen suit" provision, § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B).

The district court dismissed all the RCRA claims for a legal reason. In its view, the conceded fact that all the solid industrial wastes in the regular sewer system (including the sources of noxious fumes) mixed with untreated sanitary wastes, such as waste from toilets at the workplace, brought the defendants within the scope of RCRA's exception for "solid or dissolved material in domestic sewage." 42 U.S.C. § 6903(27). This dismissal (along with the court's dismissal of certain related pendent state tort law claims) affected 15 of 23 defendants, and it amounted to a dismissal of all claims against 6 of those 15. Five of those 6 defendants, supported by plaintiffs, asked the district court to enter a final judgment in their favor pursuant to Fed.R.Civ.P. 54(b) (permitting court to enter a final judgment on "one or more but fewer than all the claims" in an action involving multiple claims). The court did so. The plaintiffs now appeal, challenging the lawfulness of the district court's dismissal of their RCRA *injunctive* action. (They have dropped their RCRA "regulatory" claims.)

## II.

### *Jurisdiction*

■ At oral argument we asked the parties to submit briefs to help us determine whether we have jurisdiction to hear this appeal—specifically, whether Fed.R.Civ.P. 54(b)'s preconditions for entry of a "final judgment" on fewer than all claims in an action were satisfied. *See Consolidated Rail Corp. v. Fore River Ry. Co.,* 861 F.2d 322, 325 n. 2 (1st Cir.1988) (appellate court should consider Rule 54(b) jurisdiction *sua*

*sponte* ); *Spiegel v. Trustees of Tufts College,* 843 F.2d 38, 42–43 (1st Cir.1988) (noting, in light of policy "against the scattershot disposition of litigation ... that entry of judgment under the rule should not be ... routine," and explaining preconditions). After considering the briefs and reading the record, we conclude that Rule 54(b) permits the appeal.

Rule 54(b) reiterates the ordinary principle that a judicial decision does not "terminate" an action—it is not normally "final" for purposes of appeal—if it "adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties." Fed.R.Civ.P. 54(b). But, the Rule contains an important exception:

> When more than one claim for relief is presented in an action ... or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties[, but] only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

Fed.R.Civ.P. 54(b). The exception helps avoid hardship, particularly in complex, multiparty litigation; it permits a winning party to force a losing party to appeal quickly in respect to certain claims or litigants, thereby disentangling the winning party from lengthy, time consuming litigation. *See Sears, Roebuck & Co. v. Mackey,* 351 U.S. 427, 432, 76 S.Ct. 895, 897, 100 L.Ed. 1297 (1956); *Dickinson v. Petroleum Conversion Corp.,* 338 U.S. 507, 511–12, 70 S.Ct. 322, 324, 94 L.Ed. 299 (1950). Yet, because it is an exception that threatens potentially unnecessary, piecemeal appeals, the courts must administer it with care, reserving it for instances in which the relevant hardships, or administrative needs, are clear. *See Consolidated Rail,* 861 F.2d at 325; *Spiegel,* 843 F.2d at 42; *Cullen v. Margiotta,* 811 F.2d 698, 710 (2d Cir.), *cert. denied sub nom. Nassau County Republican Comm. v. Cullen,* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987).

In our view, this appeal satisfies the exception's preconditions. The case involves both multiple parties and multiple claims.

The district court entered a judgment that, as concerns the RCRA claims, is "final," for in respect to 6 of the defendants, it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945). *See Curtiss–Wright Corp. v. General Electric Co.,* 446 U.S. 1, 7, 100 S.Ct. 1460, 1464, 64 L.Ed.2d 1 (1980); *Sears, Roebuck & Co.,* 351 U.S. at 436, 76 S.Ct. at 900 (judgment that "ultimate[ly]" disposes of at least one claim in a multiple-claim action is "final" for Rule 54(b) purposes). The district court gave an "express direction for the entry of judgment." *See* Fed.R.Civ.P. 54(b). And, the court made "an express determination that there is no just reason for delay." *See* Fed.R. Civ.P. 54(b).

The district court did not "make specific findings setting forth" its reasons, *see Spiegel,* 843 F.2d at 43; *Cullen,* 811 F.2d at 711 ("certification must be accompanied by a reasoned, even if brief, explanation"), but we are prepared to overlook that fact here in light of a record that makes those reasons clear enough. *Compare Consolidated Rail,* 861 F.2d at 326 *and Spiegel,* 843 F.2d at 44 (in the absence of a statement of reasons, the appellate court, while foregoing "deference," may nonetheless allow appeal) *with National Bank of Washington v. Dolgov,* 853 F.2d 57, 58 (2d Cir. 1988) (per curiam) *and Knafel v. Pepsi Cola Bottlers of Akron, Inc.,* 850 F.2d 1155, 1159–60 (6th Cir.1988) (refusing to permit appeal because district court failed to analyze Rule 54(b) factors).

Several facts distinguish the present case from *Consolidated Rail* and *Spiegel,* in which we found entry of a Rule 54(b) judgment improper. *Consolidated Rail* and *Spiegel* both involved a single plaintiff presenting multiple claims against a single defendant; hence the action remained pending as to *all* of the parties despite the partial judgment entered. *See Consolidated Rail,* 861 F.2d at 326 (one railroad company sued another to recover fees allegedly collected on its behalf; district court granted summary judgment for plaintiff on three counts; defendant sought to appeal

while a fourth count requesting identical relief was still pending); *Spiegel*, 843 F.2d at 44 (teacher claimed defendant denying her tenure violated several different laws; district court found some of the laws were not violated; teacher sought to appeal while similar claims under other laws were still pending against defendant).

In contrast, the plaintiffs in the present case originally sued 23 defendants; the RCRA judgment completely terminates the plaintiffs' case against 6 of them. Although all of the plaintiffs' claims arise out of waste disposal at the Park, their RCRA claims do not simply repeat their Clean Water Act or Clean Air Act claims. The RCRA claims rest primarily upon the emission of noxious fumes, coming from industrial waste matter in the regular sewer pipes that run through the industrial park. The Clean Water Act claims rest primarily upon the discharge of waste from the rainwater system into the river. The Clean Air Act claims rest primarily upon the emission of fumes, not from the sewer pipe, but from chimneys and flues. The RCRA regulatory requirements differ from those of the Clean Water and Clean Air acts; and neither of the latter acts permits the type of citizens' injunctive action—to stop waste management activities that threaten "imminent and substantial endangerment"—now before us.

Moreover, many of the other defendants have settled; the remaining claims against the remaining defendants may take considerable time to try; and, given the rather small overlap in claims, it seems unlikely that a determination of the remaining claims would moot (or lead to settlement of) the issues on this appeal. *Cf. Consolidated Rail*, 861 F.2d at 326 (finding that a favorable decision on the claim remaining in the district court would moot the issue on appeal); *Spiegel*, 843 F.2d at 45–46 (finding that no significant, special hardship would be caused by delay). For these reasons, this case is sufficiently different from *Consolidated Rail* and *Spiegel* to warrant a different result. We therefore turn to the merits.

### III.

### *The Domestic Sewage Exception*

■ We now turn to the meaning of the "domestic sewage" exception. The particular RCRA provisions at issue, §§ 7002 and 7003, permit private citizens and the government to bring injunctive actions to stop the dangerous handling or disposal of "any solid waste or hazardous waste." 42 U.S.C. §§ 6972, 6973. RCRA defines "hazardous waste" as a special kind of "solid waste," 42 U.S.C. § 6903(5); hence the scope of the words "hazardous waste" is limited by RCRA's definition of the words "solid waste." RCRA's definitional section says that "solid waste"

means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, *but does not include solid or dissolved material in domestic sewage . . . .*

42 U.S.C. § 6903(27) (emphasis added). If the term "domestic sewage" means sewage that, in fact, *comes from residences*, the district court should not have dismissed the plaintiffs' case, for their complaint indicates that the relevant industrial waste was mixed with "untreated sanitary waste" —the kind of waste one might find in homes—but that this waste originated at the workplace, not in residences. We agree with the plaintiffs, and the amicus Environmental Protection Agency, that this is just what the language means.

First, the word "domestic" (coming from the Latin "domus" or "house") in ordinary English means "relating to the household or the family ... connected with the supply, service, and activities of households and private residences." *Webster's Third New International Dictionary* 671 (1976). Following the Supreme Court, " 'we assume that the legislative purpose is expressed by the ordinary meaning of the words used.' " *United States v. James*, 478 U.S. 597, 604, 106 S.Ct. 3116, 3120, 92

L.Ed.2d 483 (1986) (quoting *American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982)). *Accord Allende v. Shultz*, 845 F.2d 1111, 1116–17 (1st Cir.1988).

Second, the statutory provision defines "solid waste," not simply in terms of *type* of material, but also in terms of *source*. Thus, it speaks of material "resulting from industrial, commercial, mining, ... agricultural ... and ... community" operations and activities and then contrasts "domestic" sewage. 42 U.S.C. § 6903(27). In context, exempt *"domestic* sewage" therefore seems to refer, not simply to *type*, but also to *source*. Indeed, one suspects the statute's drafters would have used other words, such as the EPA's term "sanitary wastes," had they had only type, not source, in mind.

Third, to interpret the word as the defendants suggest, as referring only to type, might make it difficult for Congress to achieve its purpose in writing the injunctive RCRA provision. After all, most factories and industries have toilets for workers; industrial and sanitary wastes may therefore often mix in the pipes below the building; yet it is difficult to believe Congress would wish to exempt potentially large amounts of industrial waste from the statute's scope simply because they mix with some small amount of bathroom sewage.

Fourth, the legislative history suggests in various ways that Congress intended that the injunctive provision have a rather broad scope. *See, e.g.,* H.R.Rep. No. 198, 98th Cong., 2d Sess., pt. 1, at 48, *reprinted in* 1984 U.S.Code Cong. & Admin.News 5576, 5607 (amendments "clearly provide that anyone who has contributed or is contributing to the creation, existence, or maintenance of an imminent and substantial endangerment is subject to the equitable authority of Section 7003, without regard to fault or negligence"); S.Rep. No. 284, 98th Cong., 1st Sess. at 59 ("An endangerment means a risk of a harm, not necessarily actual harm, and proof that the past or present handling, storage, treatment, transportation or disposal of any solid or hazardous waste may present an imminent and substantial endangerment is grounds for an action seeking equitable relief.") (citations omitted). *See also United States v. Waste Industries, Inc.,* 734 F.2d 159, 164 (4th Cir.1984) (Congress "designed [§ 7003] to deal with situations in which the regulatory schemes break down or have been circumvented.... [Section 7003 is] a broadly applicable section dealing with the concerns addressed by the statute as a whole."). In this legislative context, it would seem somewhat anomalous to interpret the *exception* broadly and thus significantly *narrow* the statute's reach.

Finally, and most importantly, we interpret the statute as reflecting a congressional intent to give EPA considerable authority itself to interpret language like "domestic sewage" and thereby fix, at the boundaries, the precise scope of the exception. The definitional section uses highly general terms, which are neither perfectly "clear," nor clearly express an "unambiguous" congressional intent as to scope or precise boundaries. *Cf. INS v. Cardoza–Fonseca,* 480 U.S. 421, 445–48, 107 S.Ct. 1207, 1220–22, 94 L.Ed.2d 434 (1987) ("substantial deference" to agency interpretation is inappropriate when court can ascertain congressional intent on the precise question at issue); *Chevron, U.S.A., Inc. v. NRDC,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (courts will not "defer" to agency's construction of a statute when the statute represents the "unambiguously expressed intent of Congress"). The language in question constitutes a small part of a comprehensive regulatory scheme that Congress entrusted the EPA to administer, sensibly and in conjunction with other, related environmental regulatory schemes designed to secure clean water, clean air, and a safe environment. *See, e.g.,* 7 U.S.C. § 136 *et seq.* (Federal Insecticide, Fungicide, and Rodenticide Act); 15 U.S.C. § 2601 *et seq.* (Toxic Substances Control Act); 33 U.S.C. § 1251 *et seq.* (Clean Water Act); 42 U.S.C. § 300f *et seq.* (Safe Drinking Water Act); 42 U.S.C. § 7401 *et seq.* (Clean Air Act); 42 U.S.C. § 9601 *et seq.* (Comprehensive Environmental Response, Compensation, and Liability Act). *See also* 42 U.S.C. § 6905 (instruct-

ing EPA to "integrate all [RCRA provisions] for purposes of administration and enforcement and ... avoid duplication, to the maximum extent practicable, with the appropriate provisions of [other environmental protection acts]"); H.R.Rep. No. 899, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.Code Cong. & Admin.News 3608, 3628 ("The term 'solid waste disposal' is defined to exclude organic solids in untreated domestic sewage, which are already subject to the Federal Water Pollution Control Act."). The agency either has, or will develop, the type of experience that will permit it properly to mesh these related statutes, both to avoid senseless or overly harsh results, and better to fulfill their overall environmental objectives. Thus the proper application of the definitional exception raises the very sort of interstitial legal question, related to proper administration of a complex statutory scheme, to which an agency is often in a better position than a court to offer a proper answer. And, that being so, a court can appropriately infer an "implicit" congressional delegation of interpretive authority to the agency. All this is to say that this is just the kind of case in respect to which the Supreme Court has instructed us, in *Chevron,* to accord "considerable weight" to "an executive department's construction" of the statute. *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782; *see Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565, 100 S.Ct. 790, 796, 63 L.Ed.2d 22 (1980) (where Congress has left "interstitial silences within a statute," judges should be "attentive[ ] to the views of the administrative entity appointed to apply and enforce" the statute); *Mayburg v. Secretary of Health and Human Services,* 740 F.2d 100, 106 (1st Cir.1984) (contrasting "interstitial" questions of law, related to the proper administration of the statute, with more general, more important legal questions that Congress is unlikely to have wished the agency primarily to answer). And, once we give that "weight" to the agency's narrow construction of the exception, the other considerations mentioned earlier are more than sufficient to convince us to follow that construction.

The defendants reply to these arguments by pointing to a specific EPA regulation, written in respect to *other* parts of the RCRA statute, which says

(a) *Materials which are not solid wastes.* The following materials are not solid wastes for purposes of this part: (1)(i) Domestic sewage; and (ii) Any mixture of domestic sewage and other wastes that passes through a sewer system to a publicly-owned treatment works for treatment. *"Domestic sewage" means untreated sanitary wastes that pass through a sewer system.*

40 C.F.R. § 261.4 (emphasis added). The defendants note that the last sentence of this regulation defines "domestic sewage" by referring only to the *type* of waste, not to its *source;* they infer that the definition includes as "domestic sewage" sanitary wastes originating at the workplace; and they argue that EPA is bound by this definition.

We do not accept this argument for two reasons. First, EPA denies that this definition includes sanitary wastes originating in factories; it says that the definition simply refers to the kind of *residential* waste at issue; the regulation's silence about source does not mean that source is irrelevant. EPA's reading of its regulation is not totally unreasonable; and, in light of an agency's considerable legal authority to interpret its own regulations, this argument is dispositive. *See Ford Motor Credit Co.,* 444 U.S. at 565, 100 S.Ct. at 797 (courts should defer to agency's interpretation of its own regulation "unless demonstrably irrational"); *United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977) (agency interpretation of its own regulations is " 'of controlling weight unless it is plainly erroneous or inconsistent with the regulation' ") (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)); *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (same); *Donovan v. A. Amorello & Sons, Inc.,* 761 F.2d 61, 63 (1st Cir.1985) ("Courts must allow agencies to interpret their own rules, at least where those interpretations are reasonable.").

Second, as we just mentioned, the definitional regulation applies "only to wastes that also are hazardous *for purposes of* the regulations implementing *Subtitle C* of RCRA." 40 C.F.R. § 261.1(b)(1) (emphasis added). Sections 7002 and 7003 are not part of Subtitle C. Indeed, the regulation goes on to say

> A material which is not defined as a solid waste in this part, or is not a hazardous waste identified or listed in this part, *is still a solid waste* ... if ... in the case of section 7003, the statutory elements are established.

40 C.F.R. § 261.1(b)(2) (emphasis added). (Since Congress had not yet enacted § 7002(a)(1)(B) when EPA wrote this regulation, we take § 7003 to stand for the nearly identical § 7002(a)(1)(B) as well.) Defining "solid waste" more narrowly for purposes of Subtitle C than for purposes of §§ 7002 and 7003 may make sense. Subtitle C contains highly detailed recordkeeping, notification, and permit requirements; to ease administrative burdens, EPA may want to include those factory pipes that contain only a little sanitary waste, but exclude those that contain little else. Sections 7002 and 7003, on the other hand, are invoked only to respond to imminent and substantial endangerments to health or the environment; in such a context, involving a present threat to public welfare and no ongoing administrative duties, EPA may want to include even those factory pipes that contain a relatively small proportion of industrial wastes.

In any event, why, given the general broad language of the entire definitional section, could not EPA define the exception's scope somewhat differently for purposes of different parts of the RCRA statute? We concede that a court might find it difficult to uphold even minor variations in an agency's interpretation and application of the same statutory words if the *reason* for the court's "deference to administrative interpretations," *Chevron*, 467 U.S. at 844, 104 S.Ct. at 2782, were the court's belief that historical or administrative circumstances mean that the agency *likely knew better* what Congress had in mind, *see Mayburg*, 740 F.2d 100 at 105–06. The

court might ask how Congress, using a single set of words in a single statutory sentence, could have meant several different things. However, where the *reason* for the court's "deference" reflects its belief that Congress, in effect, *delegated* to the agency a degree of interpretive power, it does not seem odd to find the agency interpreting the same words somewhat differently as they apply to different parts of the statute in order better to permit that statute to fulfill its basic congressionally determined purposes. Had the statute *expressly* delegated the authority to the EPA to decide the precise scope of the various parts of the statutory definition, *see* 42 U.S.C. § 6903(27), under different parts of the statute, it would not seem at all odd to find the EPA tailoring its scope to fit the needs and objectives of the statute's different parts. Why should the EPA not have somewhat similar authority, at least to create minor differences, where the delegation is *implicit*, where the courts infer a congressional delegatory intent from the nature of the overall regulatory scheme, its heavy dependence upon sensible administration for its success, and the rather interstitial nature of the particular legal question—where such are the reasons for what the Supreme Court in *Chevron* calls "deference?" *See Chevron*, 467 U.S. at 844, 104 S.Ct. at 2782 (court may not substitute its own construction for a reasonable agency interpretation when Congress implicitly delegated authority to the agency to elucidate a specific statutory provision); *Mayburg*, 740 F.2d at 106 ("[I]f Congress is silent, courts may still infer from the particular statutory circumstances an *implicit* congressional instruction about the degree of respect or deference they owe the agency on a question of law.") (emphasis in original).

We mention this last point particularly because the record suggests there may have been a significant factual change since the plaintiffs filed the original complaint in this case. As we said at the outset, the Park's sewer pipe runs from the Park to a public sewer line. Before December 1987, that public line ran to a pub-

licly owned sewage treatment work (POTW) which did not receive sewage from residences. Since December 1987, however, the Park's sewage has been treated at another POTW which also receives sewage from residences outside the Park. Thus defendants' sewage now appears to mix with "domestic sewage" in the public line. Consequently, the district court, in working with the words "in domestic sewage," may have to define the scope of the word "in." And, the scope of that word may vary, depending upon, for example, 1) whether a householder has poured down the cellar sink a caustic waste that will mix with "sanitary waste" after a mere thirty foot pipeline voyage on its own, or 2) whether a plant pours down an industrial sink a caustic waste that will eventually mix, in a city sewer system, with residential "sanitary waste" after a three hundred foot pipeline voyage on its own. We believe that EPA's views are helpful to courts asked to resolve such statutory questions. We note that the House Report, responding to the expressed fear that creation of "private citizen" actions could lead to different, potentially conflicting, legal interpretations, stated:

It is expected that EPA and the Department of Justice will carefully monitor litigation under this provision and file, where appropriate, *amicus curiae* briefs with the court in order to assure orderly and consistent development of caselaw in this area.

H.R.Rep. No. 198, 98th Cong., 1st Sess. 53, *reprinted in* 1984 U.S.Code Cong. & Admin.News 5576, 5612. And we add that, in our view, it will be helpful if EPA continues to participate in this case, indicating its views, where appropriate, to the district court, as it continues to work with this highly complex statute.

For these reasons, the judgment of the district court is

*Vacated and the case is remanded for further proceedings consistent with this opinion.*

STATUTORY APPENDIX

42 U.S.C. § 6903(5) (1982):

The term "hazardous waste" means a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may (A) cause, or significantly contribute to an increase in mortality or an increase in serious, irreversible, or incapacitating reversible, illness, or (B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C. § 6903(27) (1982):

The term "solid waste" means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining and agricultural operations, and from community activities, but does not include solid or dissolved material in domestic sewage, or solid or dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under section 1342 of Title 33, or source, special nuclear, or byproduct material as defined by the Atomic Energy Act of 1954, as amended (68 Stat. 923).

42 U.S.C. § 6972(a)(1)(B) (Supp.1987):

[Except as provided in subsection (b) and (c) of this section, any person may commence a civil action on his own behalf (1) ... (B)] against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment....

42 U.S.C. § 6973(a) (Supp.1987):

Notwithstanding any other provision of this chapter, upon receipt of evidence

that the past or present handling, storage, treatment, transportation or disposal of any solid waste or hazardous waste may present an imminent and substantial endangerment to health or the environment, the Administrator may bring suit on behalf of the United States in the appropriate district court against any person (including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility) who has contributed or who is contributing to such handling, storage, treatment, transportation, or disposal to restrain such person from such handling, storage, treatment, transportation, or disposal, to order such person to take such other action as may be necessary, or both....