**R.R. STREET & CO., INC., Appellant,**

**v.**

**PILGRIM ENTERPRISES, INC.; Pilgrim Convenience, Inc.; R & G No. 1, Inc.; R & G No. 2, Inc.; R & G No. 3, Inc.; Pilgrim Laundry Company, Inc.; Pilgrim Equipment Co., Inc.; R.F.S., Inc. No. 8; R.F.S., Inc. No. 11; R.F.S., Inc. No. 17; S & R No. 2, Ltd.; PLC No. 11 Joint Venture; Isabella Enterprises, Inc. Liquidating Trust d/b/a Pilgrim Enterprises; Isabella Convenience, Inc. Liquidating Trust d/b/a Pilgrim Convenience Pilgrim Enterprises, Inc.; Jack J. Turk; Turk Investments, Ltd., L.L.P.; Robert Turk as Trustee to the Jerald Scott Turk 1990 Heritage Trust; Marilyn Altman Rose; Jayne Terri Paul; Cyndi Altman; and Craig Altman, Appellees.**

Pilgrim Enterprises, Inc.; Pilgrim Convenience, Inc.; R & G No. 1, Inc.; R & G No. 2, Inc.; R & G No. 3, Inc.; Pilgrim Laundry Company, Inc.; Pilgrim Equipment Co., Inc.; R.F.S., Inc. No. 8; R.F.S., Inc. No. 11; R.F.S., Inc. No.

17; S & R No. 2, Ltd.; PLC No. 11 Joint Venture; Isabella Enterprises, Inc. Liquidating Trust d/b/a Pilgrim Enterprises; Isabella Convenience, Inc. Liquidating Trust d/b/a Pilgrim Convenience Pilgrim Enterprises, Inc.; Jack J. Turk; Turk Investments, Ltd., L.L.P.; Robert Turk as Trustee to the Jerald Scott Turk 1990 Heritage Trust; Marilyn Altman Rose; Jayne Terri Paul; Cyndi Altman; and Craig Altman, Appellants,

v.

R.R. Street & Co., Inc., Appellee.

No. 01–98–01429–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 31, 2001.

Rehearing Overruled July 19, 2002.

Taylor M. Hicks, Houston, Michael A. Hatchell, Tyler, for Appellant.

Michael A. Pohl, Law Offices of Michael Pohl, Houston, Alice Oliver-Parrott, Burrow & Parrott, L.L.P.,Maria Teresa Arguindegui, Jean C. Frizzell, Houston, for Appellee.

David Kent Mestemaker, Bellaire, for Intervenor.

Jeff Nobles, N. Terry Adams, Jr., Beirne, Maynard & Parsons L.L.P., Houston, for Cross-Appellants.

Panel consists of Justices MIRABAL, NUCHIA, and PRICE.[*]

## OPINION

MIRABAL, Justice.

This appeal arises from a suit brought by Pilgrim Enterprises, Inc., and related entities [1] (collectively "Pilgrim"), and Jack Turk, and related entities and individuals (collectively "Turk"),[2] against R.R. Street & Co., Inc. (Street) to recover environmental cleanup costs and other damages incurred by Pilgrim and Turk at their respective dry-cleaning plants.

Street appeals the trial court's judgment awarding Pilgrim $1.5 million under the Texas Solid Waste Disposal Act (SWDA).[3] In two issues, Street contends that (1) Street is not a "responsible party" as defined by SWDA, and (2) the trial court erred in denying Street a jury trial on Pilgrim's SWDA claim. Further, Pilgrim and Turk appeal, contending the jury's failure to find Street liable under various common law theories was against the great weight and preponderance of the evidence. Pilgrim also contends the trial court erred in granting Street's motion for directed verdict on Pilgrim's breach of fiduciary duty claim. For the reasons set forth below, we affirm in part, and we reverse and remand in part.

## FACTUAL BACKGROUND

The Robertson family bought Pilgrim Laundry & Cleaners in 1945 and operated dry-cleaning plants in Harris and Bexar Counties until Pilgrim sold its assets in 1995. At its peak, Pilgrim had 20 dry-cleaning plants. In 1994, an environmental assessment, required as part of Pilgrim's asset sale, revealed that its dry-cleaning plants were contaminated with the dry-cleaning solvent perchloroethylene (PCE). Pilgrim notified the Texas Natural Resource and Conservation Commission (TNRCC) of the contamination and agreed to voluntarily remediate the sites.

Street, a supplier of dry-cleaning products and services, began its business relationship with Pilgrim in the 1950's. Over the years, Street supplied PCE to Pilgrim and, beginning in the 1970's, sold dry-cleaning equipment to Pilgrim.

Harold Corbin, a Street service technician, serviced the Pilgrim account from 1958 until July 1997. During this time, Corbin developed a close relationship with Pilgrim and the Robertson family. Corbin visited Pilgrim's plants regularly and had complete access to its facilities. Pilgrim relied on Corbin to give advice on dry-cleaning operations, to check and service equipment, and, in later years, to complete written evaluations of Pilgrim's operations.

---

[*] The Honorable Frank C. Price, former Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

1. The related entities are Pilgrim Enterprises, Inc.; Pilgrim Convenience, Inc.; R & G No. 1, Inc.; R & G No. 2, Inc.; R & G No. 3, Inc.; Pilgrim Laundry Company, Inc.; Pilgrim Equipment Co., Inc.; R.F.S., Inc. No. 8; R.F.S., Inc. No. 11; R.F.S., Inc. No. 17; S & R No. 2, Ltd.; PLC No. 11 Joint Venture; Isabella Enterprises, Inc. Liquidating Trust d/b/a Pilgrim Enterprises; Isabella Convenience, Inc. Liquidating Trust d/b/a Pilgrim Convenience Pilgrim Enterprises, Inc.

2. Other parties affiliated with Jack Turk involved in this case are Turk Investments, Ltd., L.L.P.; Robert Turk as Trustee to the Jerald Scott Turk 1990 Heritage Trust; Marilyn Altman Rose; Jayne Terri Paul; Cyndi Altman; and Craig Altman.

3. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 361.001—361.754 (Vernon 2001).

Because of its high cost, Pilgrim, like other dry-cleaners, recycled PCE for reuse. Street manufactured stills and filter units, which cleaned the used PCE. As a result of this cleaning process, certain waste materials were produced. The used filter cartridges had to be replaced about once a month and discarded. The dirty PCE was boiled in the stills, producing a still residue containing PCE, which also had to be discarded.

Until the mid–1980's, it was common practice for dry-cleaners to discard the still residues and spent filter cartridges in the trash. In 1986, the federal government began requiring dry-cleaners to dispose of these wastes at waste disposal facilities. Before the change in the regulations, Pilgrim threw these wastes in the trash like other dry-cleaners. In 1985, Pilgrim hired a waste disposal company, recommended by Street, to properly dispose of the wastes.

Another waste produced as a result of the recycling process is "separator water." Each still manufactured by Street contained a water separator that removed water from the used PCE. Separator water was also generated at other stages of the dry-cleaning and recycling processes.

Because PCE is water-soluble, separator water contains trace amounts of PCE, even after separation. Consistent with advice received from Street, Pilgrim discharged the separator water into buckets and then poured it into the public sewer system without further treatment. In 1995, Pilgrim began using an evaporation system to reclaim the soluble PCE from the separator water before disposing of it.

## PROCEDURAL HISTORY

In November 1995, Pilgrim filed suit against Street and numerous other PCE and equipment manufacturers and distributors to recover the cost of the environmental cleanup at 16 Pilgrim plants (11 in Houston and 5 in San Antonio) contaminated with PCE. Pilgrim asserted causes of action based on negligence, products liability, fraud, breach of fiduciary duty, and the Deceptive Trade Practices Act (DTPA). Pilgrim also brought a cost recovery action under SWDA requesting the trial court to apportion its environmental cleanup costs against the defendants. At trial, Pilgrim presented evidence that the cost of the remediation for the sites would be $7,094,940. All defendants but Street settled with Pilgrim before the case went to the jury.

Turk, the property owner of three other Pilgrim sites located at 7901 Hillcroft, 9535 Westheimer, and 7430 Long Point in Houston, intervened into the suit and asserted claims against Pilgrim and the other defendants. Pilgrim settled with Turk prior to trial and the two were aligned against Street during trial. Turk asserted common law claims for nuisance, design defect, marketing defect, negligence, and gross negligence against Street, but did not assert a SWDA claim. At trial, Turk presented evidence that it would cost $3.9 million to remediate its three properties.

During trial, the trial court sanctioned Street by striking all of its affirmative defenses because of discovery abuse.[4] At the close of Pilgrim's evidence, the trial court granted a directed verdict against Pilgrim on its breach of fiduciary duty claim against Street. At the end of the nine-week trial, the jury found no liability

4. Street was unsuccessful in its attempt to overturn the trial court's sanction through a mandamus proceeding. In this appeal, Street asserts a conditional cross-point that the trial court abused its discretion by striking its affirmative defenses; however, because of the disposition of Pilgrim's appeal, we need not address this issue.

as to Street with regard to Pilgrim's and Turk's common law claims and Pilgrim's DTPA claim. The trial court determined that Pilgrim's SWDA claim should be decided by the court, not the jury. The trial court awarded Pilgrim $1.5 million under SWDA and entered findings of fact and conclusions of law on that issue.

## DISCUSSION

### A. STREET'S APPEAL

In its first issue, Street contends that it was denied its constitutional right to a jury trial when the trial court refused to submit Pilgrim's SWDA claim to the jury. In its second issue, Street argues that it is not liable under SWDA, as a matter of law, because it is not a "responsible person" under the act. Because Street's issues are interrelated, we will consider them together.

### 1. *Constitutional Right to Jury*

Pilgrim brought a cost recovery action against Street seeking its environmental cleanup costs under SWDA section 361.344.[5] *See* TEX. HEALTH & SAFETY CODE ANN. §§ 361.271(a)(3), 361.344 (Vernon 2001). Pilgrim alleges that Street is liable under SWDA, as a matter of law, because it arranged for the disposal of solid waste at Pilgrim's facilities. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 361.271(a)(3),

361.344. Pilgrim further contends that Street was not entitled to a jury trial on its SWDA claim because whether Pilgrim was entitled to recover its environmental cleanup costs under SWDA was a question of law for the court to decide. The trial court agreed with Pilgrim.

Because SWDA enables Pilgrim to recover an equitable share of its costs of remediation, Pilgrim's cost recovery action is a statutory contribution claim. *See Compton v. Texaco, Inc.*, 42 S.W.3d 354, 362 (Tex.App.—Houston [14th Dist.] 2001, pet. denied) (referring to SWDA section 361.344 cost recovery action as "statutory contribution"); *see also* TEX. JUR. 3d *Contribution and Indemnification* § 3 (1997) ("[Contribution] proceeds on the acknowledged principles of equity and justice which require that one jointly bound by a common obligation to pay the debt of another who pays more than his ratable share shall be reimbursed by others jointly bound."). The right to contribution is based in equity. *U.S. Fid. & Guar. Co. v. Century Indem. Co.*, 78 S.W.2d 737, 738 (Tex.Civ.App.—El Paso 1935, writ dismissed); *Brown & Root v. United States.*, 92 F.Supp. 257, 261 (D.C.Tex.1950) (applying Texas Law, court stated that origin of contribution "lies in the ancient doctrine of equity courts, now enforced at law, that those who are jointly liable will share the

---

5. Section 361.344 reads in relevant part:

§ **361.344. Cost Recovery by Liable Party or Third Party**

(a) A person who conducts a removal or remedial action that is approved by the commission and is necessary to address a release or threatened release may bring suit in a district court to recover the reasonable and necessary costs of that action and other costs as the court, in its discretion, considers reasonable....

....

(c) To recover costs under this section in a proceeding that is not an appeal proceeding or an action brought by the attorney general under this subchapter, the person seeking cost recovery must have made reasonable attempts to notify the person against whom cost recovery is sought:

(1) of the existence of the release or threatened release; and

(2) that the person seeking cost recovery intended to take steps to eliminate the release or threatened release.

(d) The court shall determine the amount of cost recovery according to the criteria prescribed by Section 361.343.

TEX. HEALTH & SAFETY CODE ANN. § 361.344 (Vernon 2001).

burden equally"); *see also* 18 C.J.S. *Contribution,* §§ 3, 6 (1990).

■ There is no common-law right to a jury trial in equity. *Casa El Sol–Acapulco, S.A. v. Fontenot,* 919 S.W.2d 709, 715 (Tex.App.—Houston [14th Dist.] 1996, writ dism'd by agr.); *Trapnell v. Sysco Food Servs., Inc.,* 850 S.W.2d 529, 543 (Tex. App.—Corpus Christi 1992), *aff'd,* 890 S.W.2d 796 (Tex.1994). However, two provisions of the Texas Constitution insure the right to a jury trial. The first is contained in the Texas Bill of Rights. *See* TEX. CONST. art. I, § 15. This provision guarantees "the right to a jury in all actions where that right existed at the time the Constitution was adopted" in 1876. *Id.; State v. Credit Bureau of Laredo, Inc.,* 530 S.W.2d 288, 291 (Tex.1975). "Because the English chancery were judges of both fact and law at the time our constitution was enacted, this provision does not alter the common law tradition eschewing juries in equity actions." *Casa El Sol–Acapulco,* 919 S.W.2d at 715.

■ The second provision is found in the Judiciary Article. *See* TEX. CONST. art. V, § 10. The Judiciary Article protects the right to have a jury resolve fact questions in all "causes" brought in the district courts. *Id.; see also Credit Bureau,* 530 S.W.2d at 292–93. The law in Texas is that the right to a jury trial extends to disputed issues of fact in *equitable* as well as legal proceedings. *Casa El Sol–Acapulco,* 919 S.W.2d at 715; *Jeter v. Associated Rack Corp.,* 607 S.W.2d 272, 277–78

(Tex.Civ.App.—Texarkana 1980, writ ref'd n.r.e.).

■ Although the right to jury trial under the Judiciary Article is potentially broader than under the Bill of Rights because it covers all "causes" regardless of whether a jury was available in 1876, it can also be narrower because not all adversary proceedings are "causes" within the meaning of the Judiciary Article. *Texas Workers' Comp. Comm'n v. Garcia,* 893 S.W.2d 504, 527 (Tex.1995); *Credit Bureau,* 530 S.W.2d at 293. For example, the Texas Supreme Court observed in *Credit Bureau* that judicial review of administrative orders does not fall within the group of adversary proceedings for which a jury trial is constitutionally mandated. *See Credit Bureau,* 530 S.W.2d at 293; *see also Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 450–51 (Tex.1993).[6]

■ Thus, whether Pilgrim's SWDA claim falls within the ambit of the Judiciary Article depends on whether it is a "cause." The *Credit Bureau* court adopted several broad meanings of "cause," including: "Any question, civil or criminal, litigated or contested before a court of justice . . ." and "an legal process which a party institutes to obtain his demand or by which he seeks his right." *See Credit Bureau,* 530 S.W.2d at 292–93 (internal citations omitted). Applying these broad definitions, a SWDA cost recovery action, such as the one in this case, is a "cause" for purposes of the Judiciary Article.[7] As such, there exists a right to have

6. In support of its position that Street was not entitled to a jury trial on the SWDA claim, Pilgrim argues that the supreme court held in *Texas Ass'n of Bus. v. Texas Air Control Bd.* that the constitutional right to a jury trial does not apply to SWDA proceedings. However, *Texas Ass'n of Bus.* is inapposite to this case because it involved the appeal of an administrative order assessing fines pursuant

to SWDA, not a cost recovery action initiated in district court as in this case. *See* 852 S.W.2d 440, 450–51 (Tex.1993).

7. Several provisions of sections 361.343 and 361.344 state that the "court" shall make certain determinations relating to cost recovery actions. TEX. HEALTH & SAFETY CODE ANN. §§ 361.343, 361.344. According to Pilgrim,

a jury determine any fact issues that must be resolved with regard to Pilgrim's entitlement to recover its cleanup costs from Street under SWDA.[8] *See State v. Texas Pet Foods, Inc.*, 591 S.W.2d 800, 803 (Tex. 1979) (stating that in an equitable proceeding, "ultimate issues of fact are submitted for jury determination").

### 2. *Texas Solid Waster Disposal Act*

 To succeed on a SWDA cost recovery claim, a plaintiff must show that (1) the defendant is a "person responsible for solid waste" as provided in section 361.271;[9] (2) the TNRCC's commission approved the remedial or removal action taken by the plaintiff to cleanup the property; (3) the remedial or removal action is "necessary to address a release or threatened release" of a solid waste into the environment; (4) the costs of the remedial or removal action are "reasonable and necessary;" and (5) the plaintiff made reasonable attempts to notify the defendant of the existence of the release and that it intended to take steps to eliminate the release. *See* TEX. HEALTH & SAFETY CODE ANN. § 361.271, § 361.344 (Vernon 2001). After these elements have been established, the trial court then determines the amount of the plaintiff's recovery by apportioning the costs of the remedial or removal action among the "persons responsible for solid waste" by applying the equitable factors listed in SWDA section 361.343.[10] *Id.* § 361.271, § 361.343, § 361.344 (Vernon 2001).

### 3. *Person Responsible for Solid Waste*

 With respect to the first element, we begin our analysis by noting that

this evinces the legislature's intent to have the cost recovery action determined by the trial judge instead of the jury. We disagree. In cases in which the jury is acting as the factfinder, the word "court" means the trial judge and the jury acting together. *See Univ. of Texas at Austin v. Ables*, 914 S.W.2d 712, 718 n. 6 (Tex.App.—Austin 1996, no writ) ("It should go without saying that the word 'court' means the court acting with the jury in cases tried before both together."). "Notwithstanding lawyer slang, the words 'court' and 'judge' are not synonyms in either ordinary or legal usage." *Id.* (citing *Nalle v. City of Austin*, 101 Tex. 48, 104 S.W. 1050, 1053 (1907) and *Welch v. Welch*, 369 S.W.2d 434, 437 (Tex.Civ.App.—Dallas 1963, no writ)).

8. After deciding that Pilgrim's SWDA claim should not be decided by the jury, the trial court, in response to Street's request, filed findings of fact and conclusions of law. To the extent that there were fact issues to be resolved, they should have been resolved by the jury. However, if Street's liability can be determined as a matter of law, then it was not proper for the trial court to enter findings of fact and conclusions of law. *See McCollum v. Red River Valley Pub. Co.*, 352 S.W.2d 144, 145 (Tex.Civ.App.—Amarillo 1961, writ ref'd n.r.e.); *see also Bayou Drilling Co. v. Baillio*, 312 S.W.2d 705, 710 (Tex.Civ.App.—Houston 1958, writ ref'd n.r.e.). It is, therefore, proper for us to consider this case as if no findings of fact and conclusions of law had been filed. *McCollum*, 352 S.W.2d at 145.

9. The relevant provisions of section 361.271 read:

§ 361.271. **Persons Responsible for Solid Waste**
(a) Unless otherwise defined in applicable statutes and rules, a person is responsible for solid waste if the person:
. . . .
(3) by contract, agreement, or otherwise, arranged to process, store, or dispose of, or arranged with a transporter for transport to process, store, or dispose of, solid waste owned or possessed by the person, by any other person or entity at:
(A) the solid waste facility owned or operated by another person or entity that contains the solid waste; or
(B) the site to which the solid waste was transported that contains the solid waste. . . .
TEX. HEALTH & SAFETY CODE ANN. § 361.271 (Vernon 2001).

10. We discuss *infra* the equitable factors listed in section 361.343, which the trial court applies in apportioning costs.

interpretation of a statute is a question of law, which we review de novo. *See Mitchell Energy Corp. v. Ashworth*, 943 S.W.2d 436, 437 (Tex.1997); *Sugar Land Props., Inc. v. Becnel*, 26 S.W.3d 113, 119 (Tex. App.—Houston [1st Dist.] 2000, no pet.). Unless there is a dispute concerning the factual issues that create "arranger" status making a person responsible for solid waste, the question of "arranger" status is a question of law for the court to decide. *See State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 238 (Tex.1992) (holding issue of whether condition is a "premise defect" or a "special defect" under Texas Tort Claims Act is question of duty involving statutory interpretation and thus is issue of law for court to decide); *Kenneth H. Hughes Interests v. Westrup*, 879 S.W.2d 229, 234 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (holding issue of whether plaintiff is "consumer" under the DTPA is a question of law for court to determine).

The basic facts on which Pilgrim relies are not disputed by Street. Specifically, Pilgrim argues the following undisputed facts establish Street's arranger status:

1. Street marketed equipment (filter units, cartridges, stills and water separators) which, in their normal use, produced hazardous waste. In the 1970's and early 1980's, Street "expected" and "intended" its customers to drain its used filter cartridges overnight and then discard them in dumpsters, as was the industry practice at the time.[11]

2. Street's owner's manuals recognized and discussed that PCE leaks could occur relating to the check valves on Street's filter units.

3. Street provided technical services to Pilgrim, including recommending certain dry-cleaning equipment and processes, supervising the installation of equipment, periodic and routine inspection and maintenance of equipment, and periodic testing of equipment.

4. Street (i) recommended and introduced Pilgrim to Safety–Kleen and AAD Disposal, companies that Pilgrim used for waste disposal, (ii) acted as a liaison between them, and (iii) helped negotiate lower fees between the companies and Pilgrim.

5. Over the years, Street employee, Harold Corbin, poured PCE, which had been tested to determine detergent levels, into the sinks and commodes at Pilgrim's plants.[12]

6. As a result of the handling of PCE, the soil and groundwater at Pilgrim's 16 plants was contaminated with PCE.

No published Texas case discusses the issue of SWDA arranger liability; this is a case of first impression. Importantly, SWDA does not define the term "arranged." In construing SWDA, our objective is to determine and give effect to the intent of the legislature. *Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.*, 966 S.W.2d 482, 484 (Tex.1998); *City of Houston v. Morua*, 982 S.W.2d 126, 129 (Tex.

**11.** Stanley Mathews, Street's president from 1981 until 1991, testified as to this fact, which is otherwise uncontroverted in the record.

**12.** Although Street does not dispute that Corbin poured PCE-waste into the sewer at Pilgrim's facilities, it disputes the amount and frequency of such disposals. Street contends each vial that was used in the testing the detergent level contained only a few cc's of PCE. Corbin testified he poured vials containing PCE-waste into Pilgrim's sinks and commodes thousands of times. Some evidence exists in the record that the sewer pipes may have leaked at Pilgrim's plants, allowing the PCE-waste to seep into the soil at Pilgrim's facilities.

App.—Houston [1st Dist.] 1998, no pet.). In so doing, we look first to the plain and common meaning of the statute's words. *Liberty Mut. Ins.*, 966 S.W.2d at 484; *see also Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 865 (Tex. 1999). We also consider the entire act, its nature and object, and the consequences that would follow from each construction. *See Atascosa County v. Atascosa County Appraisal Dist.*, 990 S.W.2d 255, 258 (Tex. 1999). We must reject any statutory interpretation that defeats the legislative purpose. *See id.*

■■ SWDA appears to have been modeled after a federal environmental statute: the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA).[13] CERCLA was enacted "as a comprehensive plan to handle the nation's hazardous waste problems and to force those responsible for creating hazardous waste problems to bear the cost of their actions." *Jordan v. Southern Wood Piedmont Co.*, 805 F.Supp. 1575, 1578 (S.D.Ga.1992) (internal quotation marks omitted). CERCLA, like SWDA, allows a party, who has incurred cleanup costs, to bring a contribution claim against

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility . . . owned or operated by another party or entity and containing such hazardous substances. . . .

42 U.S.C. §§ 9613(f), 9607(a)(3) (1997). When the Texas Legislature adopts a statute with wording substantially similar to a federal statute, we presume, absent some indication to the contrary, that the legislature intended to adopt the construction placed on that wording by the federal courts, and we look to federal cases as a guide in interpreting the state statute. *Blackmon v. Hansen*, 140 Tex. 536, 169 S.W.2d 962, 964–65 (Tex.1943); *Summers v. WellTech, Inc.*, 935 S.W.2d 228, 232–33 (Tex.App.—Houston [1st Dist.] 1996, no writ); *Southern County Mut. Ins. Co. v. Ochoa*, 19 S.W.3d 452, 457 (Tex.App.— Corpus Christi 2000, no pet.).

CERCLA also does not define "arranged for," and the statute's legislative history provides little guidance for interpreting the phrase. *See United States v. Aceto Agric. Chemicals Corp.*, 872 F.2d 1373, 1380 n. 8 (8th Cir.1989). However, there exists abundant federal case law discussing who can be held liable as an "arranger" under CERCLA.

Because Congress used broad language and "liberal judicial interpretation is consistent with CERCLA's 'overwhelmingly remedial' statutory scheme," federal courts have interpreted CERCLA broadly. *Aceto*, 872 F.2d at 1380 (quoting *United States. v. Northeastern Pharm. & Chem. Co.*, 810 F.2d 726, 733 (8th Cir.1986)); *accord Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1317 (11th Cir.1990); *see also 3550 Stevens Creek Assocs. v. Barclays Bank*, 915 F.2d 1355, 1362–63 (9th Cir.1990). Accordingly, federal courts have liberally interpreted the phrase "arranged for." *Geraghty & Miller, Inc. v. Conoco, Inc.*, 234 F.3d 917, 929 (5th Cir.2000); *Department of Toxic Substances Control v. Interstate Non–Ferrous Corp.*, 99 F.Supp.2d 1123, 1145 (E.D.Cal. 2000).

■■ The Texas Legislature enacted SWDA "to safeguard the health, welfare, and physical property of the people and to protect the environment by controlling the

---

**13.** 42 U.S.C. §§ 9601–9675 (1997).

management of solid waste." TEX. HEALTH & SAFETY CODE § 361.002 (Vernon 2001). Reading SWDA as a whole, its plain language indicates a legislative intent to facilitate and encourage the prompt cleanup of solid waste. And, like CERCLA, SWDA's cost recovery provisions are clearly intended to "force those responsible for creating hazardous waste problems to bear the cost of their actions." *Jordan*, 805 F.Supp. at 1578. Because it is a remedial statute, we must give SWDA a liberal construction, rather than one that would defeat the very purpose for which it was enacted.[14] *See Burch v. City of San Antonio*, 518 S.W.2d 540, 544 (Tex.1975) (stating remedial statutes must be given "the most comprehensive and liberal construction possible"); *accord City of Mason v. West Tex. Utils. Co.*, 150 Tex. 18, 237 S.W.2d 273, 280 (1951). However, it is worth noting that from the outset, federal courts have recognized that the liability for releases under section 9607(a)(3) is not endless. *See South Florida Mgm't Dist. v.Montalvo*, 84 F.3d 402, 409 (11th Cir.1996); *see also Interstate Non–Ferrous*, 99 F.Supp.2d at 1145.

■ In determining CERCLA arranger status, courts have refused to apply a bright line test; rather, such determination has been made on a case-by-case basis using the guidelines of the relevant case law along with other pertinent factors in each individual instance. *Freeman Assocs., L.P. v. Glaxo Wellcome, Inc.*, 189 F.3d 160, 164 (2d Cir.1999); *Pneumo Abex Corp. v. High Point, Thomasville and Denton R.R. Co.*, 142 F.3d 769, 775 (4th Cir.1998); *see also United States v. Cello–Foil Prods., Inc.*, 100 F.3d 1227, 1232 (6th Cir.1996). Thus, it is appropriate for courts to take the "totality of circumstances" into consideration when determining arranger status. *Geraghty & Miller*, 234 F.3d at 929.

■ However, as one commentator noted, courts have been "less than consistent" in analyzing arranger liability. Anna Marple Buboise, *Expanding the Scope of Arranger Liability under CERCLA*, 43 U. KAN. L.REV. 469, 473 (1995); *see also* David W. Lannetti, *"Arranger Liability" Under the Comprehensive Environmental Response, Compensation, And Liability Act (CERCLA): Judicial Retreat From Legislative Intent*, 40 WM. & MARY L.REV. 279 (1998) (discussing various methods courts have used to evaluate arranger liability). Though inconsistencies exist between the various federal circuits on what is required for CERCLA arranger liability to attach, as a general proposition, the circuits agree that there must be a "nexus" between the potentially responsible party and the disposal of the hazardous substance. *See Geraghty & Miller*, 234 F.3d at 929 (stating that nexus is required before party is labeled as an arranger); *General Elec. Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 286 (2d Cir.1992) (same).

Generally, the nexus must be premised on the conduct of the party in respect to the disposal of the hazardous waste. *United States v. Arrowhead Ref. Co.*, 829 F.Supp. 1078, 1095 (D.Minn.1992). As one court noted:

> Almost all courts that have held defendants liable as arrangers have found that the defendant had some actual involvement in the decision to dispose of waste.... The few courts that have held

---

**14.** A remedial statute has been defined as "one which introduces a new regulation for the advancement of the public welfare or conducive to the public good, one enacted to afford a remedy, or one intended to correct defects, mistakes, and omissions in the laws of the State. A remedial statute generally addresses remedies or procedures." *Rey v. Acosta*, 860 S.W.2d 654, 657 (Tex.App.—El Paso 1993, no writ).

an entity responsible as an arranger in the absence of actual involvement have found that nexus between the potentially liable party and the disposal of hazardous substances to be some obligation to arrange for or direct their disposal. *AAMCO*, 962 F.2d at 286.

In several cases, courts have considered whether the defendant possessed the intent to dispose of a substance at the time of a transaction in determining CERCLA arranger liability. *See Amcast Indus. Corp. v. Detrex Corp.*, 2 F.3d 746, 751 (7th Cir.1993); *Ekotek Site PRP Comm. v. Self*, 932 F.Supp. 1328, 1336 (D.Utah 1996); *G.J. Leasing Co. v. Union Elec. Co.*, 854 F.Supp. 539, 559–560 (S.D.Ill.1994), *aff'd*, 54 F.3d 379 (7th Cir.1995). The Eighth Circuit criticized this approach, stating that requiring an intent to arrange for disposal would frustrate CERCLA's goal of requiring responsible parties to pay for hazardous substance cleanup. *Aceto Agric. Chems.*, 872 F.2d at 1380–81. Indeed, most courts have repeatedly held CERCLA to be a strict liability statute. *See In re Bell Petroleum Servs., Inc.*, 3 F.3d 889, 897 (5th Cir.1993); *Aceto Agric. Chems.*, 872 F.2d at 1377; *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1150 (1st Cir.1989); *United States v. Monsanto*, 858 F.2d 160, 167 (4th Cir.1988).

In *United States v. Cello–Foil Prods., Inc.*, the Sixth Circuit explains and reconciles the disparity between the intent requirement and strict liability nature of CERCLA:

> At first blush, discussing state of mind in a CERCLA case appears inappropriate. After all, if the tortured history of CERCLA litigation has taught us one lesson, it is that CERCLA is a strict liability statute.... Notwithstanding the strict liability nature of CERCLA, it would be error for us not to recognize the indispensable role that state of mind play in determining whether a party has "otherwise arranged for disposal ... of a hazardous substance."
>
> We derive the intent element from the canons of statutory construction. "Otherwise arranged" is a general term following in a series two specific terms and embraces the concepts similar to those of "contract" and "agreement." All of these terms indicate that the court must inquire into what transpired between the parties and what the parties had in mind with regard to disposition of the hazardous substance. Therefore, including an intent requirement into the "otherwise arranged" concept logically follows the structure of the arranger liability provision.
>
> ....
>
> [E]xamining state of mind or ascertaining intent at the contract, agreement, or other type of arrangement stage does not undermine the strict liability nature of CERCLA. The intent inquiry is geared only towards determining whether the party in question is a potentially liable party. Once a party is determined to have the requisite intent to be an arranger, then strict liability takes effect. If an arrangement has been made, that party is liable for damages caused by the disposal regardless of the party's intent that the damages not occur. Moreover, a party can be responsible for "arranging for" disposal, even when it has no control over the process leading to the release of substances.

*Cello–Foil Prods.*, 100 F.3d at 1231–32 (6th Cir.1996) (internal citations omitted).

Courts have also discussed the issue of whether the potentially responsible party must actually have "owned" or "possessed" the hazardous substance. In *United States v. Northeastern Pharmaceutical &*

*Chemical Co.,* the Eighth Circuit stated that "[i]t is the authority to control the handling and disposal of hazardous substances that is critical under the statutory scheme" in determining whether an alleged arranger owned or possessed the subject hazardous substance, because "requiring proof of personal ownership or actual physical possession of hazardous substances as a precondition for liability under CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3), would be inconsistent with the broad remedial purposes of CERCLA." 810 F.2d at 743–44.

▮ Although the federal circuits have not agreed on a uniform rule for determining CERCLA arranger status, there exist several common factors that most courts apply in determining whether a sufficient nexus exists between a party and the disposal of a hazardous substance in determining CERCLA arranger status. These factors include whether the potentially responsible party (1) had some actual involvement in the decision to dispose of the waste, or, alternatively, had an obligation to control the disposal of the waste, (2) engaged in the transaction for the purpose of waste disposal, (3) owned or possessed the waste, or (4) controlled the waste's disposal regardless of whether it owned or possessed it. *See Sea Lion, Inc. v. Wall Chem. Corp.,* 974 F.Supp. 589, 595 (S.D.Tex.1996) (discussing factors courts have considered). Because CERCLA and SWDA have similar language and purposes, we will consider these non-exclusive factors in determining whether Street is a SWDA arranger.

### 4. *Street's Arranger Status*

### a. Street's Knowledge of PCE Releases

▮ Pilgrim suggests that Street arranged for disposal of PCE wastes because it knew that (1) Street equipment generated wastes and (2) PCE spills occurred at Pilgrim's facilities. However, similar arguments have failed in other cases. In *E.S. Robbins Corp. v. Eastman Chem. Co.,* the plaintiff argued that a chemical supplier was arranging for the disposal of a hazardous substance because it knew that a certain amount of the chemical had been spilled in the past as a result of its transportation. 912 F.Supp. 1476, 1487 (N.D.Ala.1995). The *E.S. Robbins* court declined to find liability under this theory because previous spills "merely confirm that some spills have occurred in the past; they do not confirm that spills are so likely to occur that in arranging for the transportation of the chemical product, [the defendant] was really arranging for their ultimate disposal." *Id.* This reasoning is persuasive. Simply because Street was aware that PCE would be generated and possibly spilled, does not equate to arranging for disposal of PCE-waste.

### b. Street's Involvement with the Waste Disposal Companies

▮ We next examine whether Street's role in the relationship between Pilgrim and the waste disposal companies, Safety–Kleen and AAD Disposal, render Street a SWDA arranger. The record shows that Street recommended Safety–Kleen and AAD to Pilgrim. The record also reveals that the waste disposal services provided by AAD resulted in spills and leaks at some of Pilgrim's facilities. For example, PCE-waste leaked from waste disposal drums supplied by AAD at some of Pilgrim's facilities.

Doug Mulvaney, Pilgrim's in-house counsel, testified that to comply with the federal regulations regarding waste disposal that were effective in late 1986, Street recommended that Pilgrim use Safety–Kleen for waste disposal. Pilgrim began using Safety–Kleen in 1985, and

continued to use them until it began using AAD in 1991.

In *United States v. Bliss,* the court imposed CERCLA arranger liability on a defendant who had actively participated as a broker in the disposal of its customer's waste. 667 F.Supp. 1298 (E.D.Mo.1987). The basis for the liability finding was that the broker had authority to choose the waste disposal company under its contract with the waste generator. *Id.* at 1306. Thus, the broker had the "authority to control the place and manner of disposal." *Id.* at 1307.

Here, Street did not have the authority to select either Safety–Kleen or AAD, or to control the manner of waste disposal. With regard to Safety–Kleen, the record shows that Street recommended it to Pilgrim, but there is no indication that Street had the authority to make the ultimate decision to hire Safety–Kleen.

AAD's president, Harry Pourat, testified that Street introduced AAD to Pilgrim and helped it obtain Pilgrim's account. Pourat stated that Corbin acted as an "advisor" and helped negotiate a lower fee with Pilgrim. Pourat's contacts with Pilgrim were Doug Mulvaney, Pilgrim's in-house counsel, Pilgrim's plant managers, and Corbin. Pourat stated it "seemed like [Corbin] worked for Pilgrim" and that Corbin would "follow up and make sure that things were done for Pilgrim."

Although Street recommended AAD and assisted with the negotiations, nothing indicates that it was the ultimate decision of Street to retain AAD. To the contrary, Guy Robertson, Sr., former president of Pilgrim Cleaners, testified that Street requested that Pilgrim switch to AAD because Safety–Kleen had begun selling cartridges in competition with Street. Robertson stated that Pilgrim "*accommodated* Mr. Corbin and [Street's president] and ... switched to AAD at

Mr. Corbin's and Street's request." Mulvaney testified that Street introduced AAD to Pilgrim and stated: "[Street] came to us and said that we are promoting and want y'all to do business with AAD, *if you will, please.*" This evidence indicates that it was Pilgrim's decision whether to hire AAD. Moreover, the record shows that correspondence describing the services that AAD would supply to Pilgrim was addressed to Mulvaney, not Street. And the contract for waste disposal services was between Pilgrim and AAD, not AAD and Street.

■ Street's role as a liaison between Pilgrim and AAD also does not support arranger liability. Though the evidence shows that Corbin acted as liaison between the companies, this is not evidence that Corbin or Street had the ability to make the ultimate decisions regarding the method or manner of waste disposal at Pilgrim's facilities.

### c. Technical Services and Advice

■ Pilgrim argues that Street became an arranger by providing technical advice and services to Pilgrim, including those relating to waste disposal. We agree.

In *Edward Hines Lumber Co. v. Vulcan Materials Co.,* the defendant sold chemicals to a lumber treatment facility, advised and consulted the facility concerning the design and location of treatment systems, trained facility employees, had access to the facility, and provided technical assistance. 685 F.Supp. 651, 656–57 (N.D.Ill. 1988), *aff'd,* 861 F.2d 155 (7th Cir.1988). However, the chemical supplier was found to have incurred no CERCLA liability despite its extensive relationship with the lumber treatment facility because the evidence showed that (1) the chemical supplier sold the chemical for the purpose of wood treatment and not for disposal of its own wastes, and (2) the chemical supplier

did not decide how the hazardous substance would be disposed of after its use in the wood treatment process. *Id.*

■ The court in *Jordan v. Southern Wood Piedmont Co.* reached a similar conclusion. 805 F.Supp. at 1580. The *Jordan* court held that Dow Chemical, Co., the manufacturer and vendor of a chemical used in a wood processing plant, was not a CERCLA arranger even though the plaintiffs presented evidence showing that Dow communicated to the plaintiffs its expertise and offered to assist its customers in handling the chemicals. *Id.* at 1580–81. The *Jordan* plaintiffs argued that because Dow had sent bulletins with information regarding the safe handling of the chemicals and offered technical assistance, it had arranged for the disposal of chemicals. *Id.* at 1580. However, the *Jordan* court found that the such evidence did not support arranger status because there was no evidence that the plaintiffs had contacted Dow for advice, or that Dow had given the plaintiffs advice concerning chemical disposal. *Id.* The *Jordan* court reasoned as follows:

> Adoption of Plaintiffs' arguments, without concrete evidence establishing those bulletins as an attempt by [defendant] to arrange for the disposal of chemicals, would discourage chemical manufacturers from offering expertise to those experiencing problems and thereby increase the risk of future hazardous

waste incidents. Such a result is decidedly contrary to the intent of CERCLA. *Id.; see also E.S. Robbins,* 912 F.Supp. at 1487 (holding that chemical supplier's studies of how to prevent chemical spills during shipping and advice to carriers regarding safe handling of chemicals did not establish arranger liability). We agree that sending technical bulletins relating to waste disposal does not constitute arranging for disposal of a solid waste. However, this case is distinguishable from *Jordan* because Street actually gave direct advice to Pilgrim as to how to dispose of waste containing PCE. Here, Street's president and chief executive officer, Leslie Ross Beard, testified that he knew that Harold Corbin advised Street to dispose of PCE-containing separator water by dumping it into the public sewer. By instructing Pilgrim to dispose of the separator water in this manner, Street had some actual involvement in the decision to dispose of the waste, and gave such advice for the purpose of disposing of waste. The evidence reveals that Pilgrim trusted and relied on Corbin's advice almost all the time relating to the operation of its facilities, and Corbin had complete access to Pilgrim's plants. In sum, Corbin was integrally involved in the operation of Pilgrim's facilities.[15] Such evidence shows that Street controlled the disposal of the separator water even though it did not own or possess it.[16]

**d. Corbin's Conduct**

---

15. Pilgrim also contends that Street's arranger status is established by Street recommending certain dry-cleaning equipment and processes, supervising the installation of equipment, periodic and routine inspection and maintenance of equipment, and periodic testing of equipment. However, Pilgrim fails to explain how such evidence supports Street's arranger status, and we fail to see the connection.

16. Pilgrim's former president, Guy Robertson, Sr., testified that Corbin instructed Pil-

grim to dispose of its used filter cartridges and still residues in the trash, which was the industry practice at the time. However, Robertson also admitted that this was already Pilgrim's method of disposal of these wastes at the time Corbin gave Pilgrim such instruction. Corbin testified that he never instructed Pilgrim to dispose of still residues in the trash. Thus, it is not clear that such evidence, as to disposal of used filter cartridges and still residues, supports a finding of arranger status for Street.

■ Corbin testified that when visiting Pilgrim's facilities, he performed titration tests on the PCE to determine the concentration of the detergent. To do this, he would remove PCE from a dry-cleaning machine, mix it with other chemicals in a vial, and then he disposed of it by pouring it in the sink or commode. When questioned how many times he had done this at Pilgrim's plants, Corbin responded "thousands, I guess."

By choosing to pour the PCE-mixture in the sink or commode, Corbin (1) took an active role in the disposal of PCE, (2) intended to dispose of the PCE, (3) "possessed" the PCE, and (4) controlled the method and manner of the disposal. By so acting, he arranged for the disposal of PCE at the sewage treatment plant to which the PCE would travel through the sewer pipes.

We conclude that the evidence establishes as a matter of law that Street, through Corbin, "arranged" to dispose of solid waste by (1) instructing Pilgrim to pour its separator water into the sewer and (2) pouring the PCE-mixture into Pilgrim's sinks and commodes. Thus, Street is a "person responsible for solid waste" as a matter of law under SWDA. *See* Tex. Health & Safety Code Ann. § 361.271(a)(3).

### 5. *Domestic Sewage Exclusion*

■ Street claims that the PCE poured into the sewer system was not a disposal of a "solid waste" as required by SWDA. *Id.* "Solid waste" is defined in the act as:

[G]arbage, rubbish, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility, and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, municipal, commercial, mining, and agricultural operations and from community and institutional activities.

*Id.* § 361.003(34) (Vernon 2001). Clearly, the PCE-mixture that Corbin poured in the sinks and commodes of Pilgrim's facilities constituted "discarded material." However, SWDA's definition of solid waste is subject to the limitations of the federal "domestic sewage exclusion" found in the Resource Conservation and Recovery Act (RCRA),[17] 42 U.S.C. § 6903(27), and 40 C.F.R. § 261.4(a). *See* Tex. Health & Safety Code Ann. § 361.003(34).

■ RCRA's section 6903(27) defines "solid waste," but specifically excludes from that definition "solid or dissolved material in domestic sewage...." 42 U.S.C. § 6903(27) (1994). The regulatory section, 40 C.F.R. § 261.4, referred to in SWDA's definition of solid waste reads, in part:

(a) Materials which are not solid wastes. The following materials are not solid wastes for the purpose of this Part:

(1)(i) Domestic sewage; and

(ii) Any mixture of domestic sewage and other wastes that passes through a sewer system to a publicly-owned treatment works for treatment. "Domestic sewage" means untreated sanitary wastes that pass through a sewer system.

40 C.F.R. § 261.4(a)(1) (2000). Street claims that the small amount PCE poured into the sewer system by Corbin was not disposal of a "solid waste" as defined by SWDA because it falls within the regulatory domestic sewage exclusion of 40 C.F.R. § 261.4(a)(1)(ii). Street contends that the

---

**17.** RCRA directs the EPA to establish a comprehensive "cradle to grave" system regulating the generation, transport, storage, treatment, and disposal of hazardous wastes. *See* 42 U.S.C. §§ 6921–6939b (1994).

domestic sewage exclusion found in section 261.4(a)(1)(ii) is broader than that found in RCRA section 6903(27) and applies the moment that the discarded material enters the sewer system.

Relying on federal case law interpreting the domestic sewage exclusion, Pilgrim argues that the exclusion does not apply in this case. Street responds that the cases relied on by Pilgrim are inapplicable because they interpret the statutory domestic sewage exclusion found in RCRA, not the broader, regulatory domestic sewage exclusion that Street relies on found in 40 C.F.R. § 261.4. However, SWDA's definition of "solid waste" states that it is limited by RCRA section 6903(27) **and** 40 C.F.R. § 261.4(a). *See* TEX. HEALTH & SAFETY CODE ANN. § 361.003(34). Thus, the legislature intended that SWDA's definition of solid waste be subject to *both* domestic sewage exclusion provisions.

The court in *Comite Pro Rescate De La Salud v. Puerto Rico Aqueduct and Sewer Auth. (PRASA )*, was the first to consider RCRA's domestic sewage exclusion. 888 F.2d 180 (1st Cir.1989). In *PRASA,* the plaintiffs alleged that factory owners in a large industrial park violated RCRA's hazardous waste disposal prohibitions by discharging certain solid wastes into the sewer and sought injunctive relief. *Id.* at 182. The sewer lines that connected the industrial park to a sewage treatment plant did not connect with lines running from private homes. *Id.* The First Circuit concluded that "domestic sewage" means sewage that comes from residences, and even if the wastes at issue had mixed with untreated sanitary waste that came from the workplace (rather than from residences), RCRA's domestic sewage exclusion would not apply. *Id.* at 184–85.

The *PRASA* court provided several reasons for its conclusion. First, the plain meaning of "domestic" is "relating to the household or the family ... connected with the supply, service, and activities of households and private residences." *Id.* at 184 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 671 (1976)). Second, section 6903(27) defines "solid waste" by source, rather than just type, so "domestic" sewage means sewage from a domestic source. *Id.* at 185. Third, the construction urged by the *PRASA* defendants contravened the purposes of RCRA, because "it is difficult to believe Congress would wish to exempt potentially large amounts of industrial waste from the statute's scope simply because they mix with some small amount of bathroom sewage." *Id.* Fourth, Congress intended that the scope of RCRA's injunctive relief provision be broad, and it would seem somewhat "anomalous to interpret the exception broadly and thus significantly narrow the statute's reach." *Id.* Lastly, the EPA, as amicus, argued against the defendants' proposed construction, and the court accorded considerable weight to the agency's view of a statute it administers. *Id.* at 185–86.

Although there was no evidence in this case regarding whether the sewer lines from Pilgrim's plants connected with those from residences, the reasoning of the *PRASA* court is instructive. To allow industrial waste-generators to avoid the reach of a cost recovery action by disposing of its waste down the sewer, would not only frustrate SWDA's statutory scheme, but defeat the act's remedial purpose.

The court in *Lincoln Props., Inc. v. Higgins,* had to decide whether PCE discharged into the sewer system by a drycleaner fell within RCRA's domestic sewage exclusion. 23 ENVTL. LAW REP. 20,665 (E.D.Cal.1993). The court held that it did not. *Id.* at 20,671. In reaching this decision the court stated:

> The exclusion covers "solid or dissolved material in domestic sewage." Any min-

gling of the dry cleaners' sewage with residential sewage occurred "downgradient from," or past, the portions of the sewage lines from which PCE leaked. Thus, the PCE at issue—the PCE that leaked into the soil and groundwater—did not mix with the sewage from residential sources and was therefore never "solid or dissolved material in domestic sewage."

*Id.* at 20,670.

The *Lincoln* court also stated that, even if the broader, regulatory domestic sewage exclusion applied, the PCE would not fall under that domestic sewage exclusion because it escaped into the soil and groundwater and never reached "a publicly-owned treatment works" as required by 40 C.F.R. § 261.4(a)(1)(ii). *Id.* at 20,671.

We find the reasoning in *Lincoln* persuasive. The regulatory domestic sewage exclusion does not apply to the facts of this case. Here, the PCE-waste that contaminated Pilgrim's sites would not fall under the regulatory domestic sewage exclusion because the PCE-waste found in the soil and groundwater at Pilgrim's plants were, at that point, not mixed with domestic sewage and would never reach "a publicly-owned treatment works." 40 C.F.R. § 261.4(a)(1)(ii).

■■■ We conclude that neither the statutory nor the regulatory domestic sewage exclusion applies to the PCE-wastes discarded by Corbin into the sewer, and that such conduct constituted "disposal of solid waste."

### 6. *Causation*

■■■ Street also contends that SWDA requires Pilgrim to show that Street's conduct "caused" it to incur its environmental cleanup costs. In support of this argument, Street cites federal cases for the proposition that, in CERCLA cases, the plaintiff seeking contribution must show that the defendant's conduct caused it to incur response costs. Although the liability standard in CERCLA subsection 9607(a) states that an arranger shall be liable for any "release which *causes* the incurrence of response costs," neither SWDA section 361.271 nor 361.344 contain a similar requirement for determining whether a plaintiff can sustain a cost recovery action against a defendant.[18] 42 U.S.C. 9607(a)(4) (1997) (emphasis added); *see also* TEX. HEALTH & SAFETY CODE ANN. §§ 361.271, 361.344. Rather, a causation-like factor is taken into consideration by the trial court in apportioning costs *after* a defendant has been found to be a "person responsible for solid waste." *See* TEX. HEALTH & SAFETY CODE ANN. § 361.343(a)(1) (stating apportionment made according to "the relationship between the parties' actions in storing, processing, and disposing of solid waste and the remedy required to eliminate the release or threatened release").[19]

### 7. *Other SWDA Provisions*

As discussed above, to succeed on its SWDA cost recovery action, Pilgrim must not only show that Street is "a person responsible for solid waste," but must also establish that (1) the TNRCC's commis-

---

**18.** We note that most federal courts have held that, because CERCLA is a strict liability statute, plaintiffs are generally not required to prove causation to establish liability. *See OHM Remediation Servs. v. Evans Cooperage Co., Inc.,* 116 F.3d 1574, 1578–79 (5th Cir. 1997).

**19.** This is similar to how "causation" is viewed by most federal courts in CERCLA contribution cases. *See Kalamazoo River Study Group v. Menasha Corp.,* 228 F.3d 648, 656–57 (6th Cir.2000) (stating that consideration of causation in CERCLA contribution action is proper only in allocating response costs, not in determining liability).

sion approved Pilgrim's remedial actions; (2) the remedial actions are "necessary to address a release or threatened release" of a solid waste into the environment; (3) the cleanup costs are "reasonable and necessary;" and (4) Pilgrim made reasonable attempts to notify Street of the existence of the release and that it intended to take steps to eliminate the release. *See id.* §§ 361.271, 361.344.

▉ Street contends that these issues were either not established by Pilgrim, or require factual determinations to be made by the jury. However, if Pilgrim conclusively established these issues as a matter of law, then the trial court did not err in failing to submit them to the jury. *See* TEX.R. CIV. P. 279; *T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 222–23 (Tex.1992); *see also European Crossroads' Shopping Ctr., Ltd. v. Criswell,* 910 S.W.2d 45, 56 (Tex.App.—Dallas, writ denied) ("When a party conclusively proves a vital fact or does not contradict a vital fact, its effect is a question of law and there is no issue for the jury.").

### a. Approval

▉ Pilgrim was required to show that its remedial actions were "approved by the [TNRCC] commission." *See* TEX. HEALTH & SAFETY CODE ANN. § 361.344(a). What constitutes approval is not defined by SWDA. The undisputed evidence showed that (1) Pilgrim entered into an agreement with the TNRCC under the Texas Voluntary Cleanup Program [20] to remediate the sites, and (2) the TNRCC approved Pilgrim's "closure plan" for each site. In keeping with the remedial purposes of SWDA, we hold such undisputed evidence

establishes approval by the TNRCC for purposes of bringing a cost recovery action.

### b. Release

▉ Section 361.344 cost recovery actions apply to remedial actions that are "necessary to address a release or threatened release" of a solid waste into the environment. *Id.* § 361.344. A "release" is "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." *Id.* § 361.003(28) (Vernon 2001).[21]

▉ Street argues that a fact issue exists regarding whether there was a "release" of PCE into the environment. However, Street does not dispute that Pilgrim's properties were contaminated with PCE. Because the undisputed evidence shows that the groundwater and soil at the sites were contaminated with PCE, Pilgrim has conclusively shown that there was a "release" of PCE at the sites.

### c. Reasonable and Necessary Costs

▉ In a section 361.344 cost recovery action, a plaintiff may bring suit to recover the "reasonable and necessary costs" of its remedial action. *See id.* § 361.344. Street contends that the issue of "reasonable and necessary costs" should have been submitted to the jury.

▉ Michael Marcon, Pilgrim's expert who provided technical guidance for the cleanup at Pilgrim's sites, testified regarding the remediation methods utilized at each location and the associated costs for these actions. He stated that all of the

---

20. *See* HEALTH & SAFETY CODE ANN. §§ 361.601–.613 (Vernon 2001) (setting forth requirements and parameters of Texas Voluntary Cleanup Program).

21. Certain activities are excluded from the statutory definition of "release," which are not relevant to this case. *See* TEX. HEALTH & SAFETY CODE § 361.003(28)(A)—(E) (Vernon 2001).

sites had PCE-contaminated soil, and all but one of the Houston sites had groundwater contamination that required remediation; none of the San Antonio sites had groundwater contamination. At the time of trial, remediation had been completed at the San Antonio sites and the one Houston location that did not have groundwater contamination; however, groundwater remediation was ongoing at the remaining Houston sites.

To remediate the groundwater, Pilgrim employed a "groundwater recovery system." This process entailed pumping the groundwater to the surface, filtering it through activated carbon, and then discharging it into the public sewer system or onto the ground. Pilgrim was also required to monitor the groundwater at the affected sites for two years following the completion of the groundwater remediation.

To address the soil contamination, Pilgrim covered the affected soil with an eight-inch concrete cap and a synthetic liner. The purpose of the cap was to divert rainwater from the soil to prevent the contaminants from being carried down to the groundwater.

Marcon testified that, at the time of trial, Pilgrim had spent $3,704,987 to remediate its sites, and would spend an additional $1,231,953 to clean up its own properties and an additional $2,158,000 for neighboring properties that were contaminated for a total of $7,094,940.[22]

Street's environmental expert, Richard Adams, stated that, in his opinion, groundwater remediation was not required at four of Pilgrim's sites—Chimney Rock, Fondren, Jones Road, and West Bellfort. According to Adams, groundwater remedia-

tion was not required at the four sites because the groundwater at these locations will never be used as drinking water. Relating to the soil contamination, Adams stated that the concrete cap was unnecessary because Pilgrim could have achieved the same objective (i.e., preventing rainwater from filtering through the soil and thereby carrying contaminants to the groundwater), and saved significant expense, by sealing any cracks in the asphalt.

According to Adams, a 40 percent reduction should be taken on the amount Pilgrim seeks to remediate the sites. In his opinion, the "reasonable and necessary" remediation costs for these sites should be $4,253,000.

Because SWDA does not define what constitutes "reasonable and necessary costs," we again look to federal case law interpreting similar language in CERCLA to aid us in defining this phrase.

CERCLA allows private litigants to recover the "necessary costs of response;" however, CERCLA does not define this phrase. *See* 42 U.S.C. § 96-7(a)(4)(B). Courts have held that to show response costs were "necessary," CERCLA plaintiffs must demonstrate that (1) the costs were incurred in response to a threat to human health or the environment, and (2) the costs were necessary to address that threat. *G.J. Leasing Co., Inc. v. Union Elec. Co.,* 854 F.Supp. 539, 561 (S.D.Ill. 1994), *aff'd,* 54 F.3d 379 (7th Cir.1995); *see also Southfund Partners III v. Sears, Roebuck & Co.,* 57 F.Supp.2d 1369, 1378 (N.D.Ga.1999); *Foster v. United States,* 922 F.Supp. 642, 652 (D.D.C.1996); *Artesian Water Co. v. Gov't of New Castle County,* 659 F.Supp. 1269, 1278 (D.Del. 1987), *aff'd,* 851 F.2d 643 (3d Cir.1988).

**22.** Pilgrim also offered evidence that of the $7,094,940 needed for the remedial action, $6,799,104 was attributable to Street.

As mentioned above, the Texas Legislature states the purpose of SWDA is "to safeguard the health, welfare, and physical property of the people and to protect the environment by controlling the management of solid waste, including accounting for hazardous waste that is generated." TEX. HEALTH & SAFETY CODE § 361.002. Thus, it is consistent with the stated purpose of SWDA to require a plaintiff to demonstrate that its remedial costs are "reasonable and necessary" by showing that the costs are (1) incurred in response to a threat to human health or the environment, and (2) necessary to address that threat.

The record contains Pilgrim's "closure plans" that were submitted to the TNRCC for each of the sites. Each closure plan includes a remedial investigation report, a baseline risk assessment, a corrective measures study, and a description of proposed remedial activities.

Despite Street's expert testimony disputing the necessity and reasonableness of groundwater remediation at the Chimney Rock, Fondren, Jones Road, and West Bellfort sites, the site closure plans state that PCE and other contaminants were found in the groundwater at these four locations at levels above the federal and state groundwater standards for drinking water. The record also contains correspondence from the TNRCC dated February 1, 1996, approving the closure plans, including the proposed remedial actions for all 16 sites.

In addition to approving the closure plans, the TNRCC also required Pilgrim to take further action than that stated in the closure plans for many of the sites. With regard to requiring additional activities at the Chimney Rock, Fondren, Jones Road, and West Bellfort sites, the TNRCC stated:

*10154 Jones road, Houston, Texas—VCP 0148*

Chlorinated organics were noted in the groundwater samples collected from monitor well MW–6, located in the northeast corner of the Pilgrim property, and in MW–9 located offsite to the northeast. Offsite notification, investigation and if necessary remediation, should be undertaken to the north and east of the site.

*6701 Chimney Rock, Houston, Texas— VCP 062*

Chlorinated organics were noted in the groundwater samples collected from monitor well MW–4 located in the northeast corner of the Pilgrim property. Offsite notification, investigation and if necessary remediation, should be undertaken to the north and east of the site.

*10616 West Bellfort, Houston, Texas— VCP 062*

[PCE] was noted in the groundwater monitor wells located on the northern boundary of the site at levels ranging from 17 to 26 ppm. . . .

During installation of the groundwater recovery system a groundwater monitor well should be installed . . . to monitor the effectiveness of the system.

. . . .

*11322 Fondren, Houston, Texas—VCP 116*

Chlorinated organics were noted in the groundwater samples collected from monitor well MW–1 which is located near the southern property boundary that is shared with several residences. Although [PCE] was not detected in the groundwater sample collected in the easement on the south side of the residential property, conclusive evidence was not presented that [PCE] was not

present <u>under</u> the residence(s); therefore, the TNRCC requires that offsite property owner(s) to the south and east who may have [PCE] underlying their property be notified of the potential for [PCE] to be present in the shallow groundwater underlying their property. This should be followed by the appropriate investigation and remediation activities. Pilgrim must provide proof of notification and documentation of investigation and remediation activity.

(Underlined emphasis in the original.)

With regard to remediation of the contaminated soil, Pilgrim's closure plans proposed that the soil be covered with a concrete cap and a synthetic liner. The closure plans recommended that the concrete cap be eight inches thick (but "at least" six inches at the Jones Road site). The TNRCC approved the proposed soil remediation and stated:

Soil Remediation—Composite Cap

The Composite Cap composed of 8″ of concrete and a 40 mil synthetic liner should be maintained in a condition to achieve its intended purpose as long as contaminants are present in the soil at levels that exceed groundwater protection cleanup levels. *It is anticipated that the cap will be necessary indefinitely....*

(Emphasis added.)

The presence of contaminants in the soil and groundwater at levels above those allowed by state and federal standards establishes a threat to human health and the environment. This conclusion is bolstered by the TNRCC's approval of Pilgrim's proposed remedial actions that are designed to remedy the contamination.[23] It

is uncontroverted that Pilgrim's costs associated with its remedial actions are being incurred in response to the soil and groundwater contamination. As to the necessity of these activities, the evidence showed that the TNRCC not only approved the proposed remedial activities but also *required* activities at most sites *in addition to* those proposed by Pilgrim. Such evidence establishes necessity. Thus, Pilgrim conclusively established that its remedial costs were "reasonable and necessary."

Such holding is consistent with the broad, remedial purpose of SWDA to protect human health and promote the prompt cleanup of solid waste, which we are required to construe liberally.

**d. Attempts to Notify**

Street also correctly states that to succeed on its section 361.344 cost recovery action, Pilgrim had to show that it "made reasonable attempts to notify [Street] ... of the existence of the release ... and that [Pilgrim] intended to take steps to eliminate the release...." *Id.* § 361.344(c). Street contends that this issue should have been submitted to the jury.

■■■ Guy Robertson, Sr. testified that he notified Street's president about the contamination and requested Street to participate in the cleanup. Street does not dispute Robertson's testimony on this point and offered no evidence to the contrary. Because Robertson's undisputed testimony shows that Pilgrim notified Street of the existence of the release and that Pilgrim intended to take steps to eliminate the release, it conclusively estab-

---

**23.** In the February 1, 1996 correspondence, the TNRCC states that it is approving Pilgrim's closure plans and not the "actual cleanup activities." However, at the time this lawsuit was brought and tried, cleanup activities at a majority of the sites were still ongoing and would be for some time. Thus, it was sufficient for Pilgrim to show that the TNRCC approved the closure plans, which necessarily included the proposed remedial activities.

lished that Pilgrim made reasonable *attempts* to make such notification. *Id.*

Because Pilgrim conclusively established as a matter of law that (1) Pilgrim's remedial actions were approved by the TNRCC; (2) there was a "release" of solid wastes (i.e., PCE) into the environment; (3) the remediation costs Pilgrim seeks are "reasonable and necessary;" and (4) Pilgrim made reasonable attempts to notify Street of the existence of the release and that it intended to take steps to eliminate the release, the trial court did not err in failing to submit these issues to the jury.

### 8. Apportioning Costs

■■■ Once a plaintiff has shown that the defendant is a "person responsible for solid waste," and established the other essential elements of a SWDA cost recovery action, then subsection 361.344(d) requires the trial court to determine the amount of the plaintiff's cost recovery by applying the criteria listed in section 361.343. *See id.* §§ 361.343, 361.344(d).

Section 361.343 provides:

### § 361.343. Apportionment of Costs

(a) Apportionment of costs for the elimination of the release or threatened release of solid waste among the persons responsible for solid waste under Section 361.271 shall be made according to:

(1) the relationship between the parties' actions in storing, processing, and disposing of solid waste and the remedy required to eliminate the release or threatened release;

(2) the volume of solid waste each party is responsible for at the solid waste facility or site to the extent that the costs of the remedy are based on the volume of solid waste present;

(3) consideration of toxicity or other waste characteristics if those characteristics affect the cost to eliminate the release or threatened release; and

(4) a party's cooperation with state agencies, its cooperation or noncooperation with the pending efforts to eliminate the release or threatened release, or a party's actions concerning storing, processing, or disposing of solid waste, as well as the degree of care that the party exercised.

(b) In apportioning costs under Subsection (a), the court shall credit against a responsible party's share of the costs of eliminating a release or threatened release of solid waste the party's expenditures related to the cleanup at issue if the commission or the executive director approves the cleanup. If the expenditures were made before the property was proposed to be listed on the state registry and the commission or the executive director approves the cleanup, the court shall also reduce in an equitable and just manner the party's proportionate share of the costs. . . .

*Id.* § 361.343(a),(b).

After applying these criteria, the trial court in this case found Street's proportionate share of the cleanup costs to be $1.5 million and entered judgment against Street for that amount, plus interest. Street contends that questions of fact exist relating to the section 361.343 criteria which should have been determined by the jury.

■■■ Like contribution, apportionment of damages is inherently equitable in nature. As a general rule, the jury does not determine the expediency, necessity, or propriety of equitable relief. *Burrow v. Arce*, 997 S.W.2d 229, 245 (Tex.1999); *Texas Pet Foods*, 591 S.W.2d at 803. Applying this principle, the amount of cleanup costs apportioned to each responsible party under SWDA should be determined by the trial judge according to the equitable criteria listed in section 361.343. Howev-

er, it is also well established that when contested fact issues must be resolved before equitable relief can be determined, a party is entitled to have that resolution made by a jury. *See Texas Pet Foods,* 591 S.W.2d at 803.

The case of *Burrow v. Arce* is illustrative of this point. In *Burrow,* the Texas Supreme Court listed factors to consider in applying the equitable remedy of fee forfeiture in cases involving a breach of fiduciary duty to a client by an attorney. These factors are (1) the gravity and timing of the violation, (2) its wilfulness, (3) the effect on the value of the lawyer's work for the client, (4) any other threatened or actual harm to the client, and (5) the adequacy of other remedies. *Burrow,* 997 S.W.2d at 243. The *Burrow* court stated that the ultimate decision on the amount of fee forfeiture must be made by the trial judge. *Id.* at 245. Factors such as "the adequacy of other remedies and public interest in protecting the integrity of the attorney-client relationship, as well as weighing other relevant considerations, present legal policy issues well beyond the jury's province of judging credibility and resolving factual disputes." *Id.*

However, before the trial judge determines whether a clear and serious violation of duty occurred, whether forfeiture is appropriate, and if so, whether all or part of the attorney's fee should be forfeited, the trial judge must first decide whether factual disputes exist that must be determined by a jury related to these issues. *See id.* at 246. The *Burrow* court explained that in a fee forfeiture case

> [s]uch factual disputes may include, without limitation, whether or when the misconduct complained of occurred, the attorney's mental state at the time, and the existence or extent of any harm to the client. If the relevant facts are undisputed, these issues may, of course, be

determined by the court as a matter of law. Once any necessary factual disputes have been resolved, the court must determine, based on what we have set out, whether the attorney's conduct was a clear and serious breach of duty to his client and whether any of the attorney's compensation should be forfeited, and if so, what amount. Most importantly, in making these determinations the court must consider whether forfeiture is necessary to satisfy the public's interest in protecting the attorney-client relationship. The court's decision whether to forfeit any or all of an attorney's fee is subject to review on appeal as any other legal issue.

*Id.*

 Likewise, in SWDA cost recovery actions, the ultimate decision regarding the amount of cleanup costs to be apportioned to each responsible party must be made by the trial judge, not the jury. However, any factual disputes relating to the equitable criteria listed in subsection 361.343(a)(1)—(4) should be determined by the jury. Such factual disputes may include (1) the relationship between the party's actions in storing, processing, and disposing of solid waste and the remedy required to eliminate the release; (2) the volume of solid waste each party is responsible for at the site; (3) the toxicity and other characteristics of the solid waste attributable to each party; and (4) to what extent a party cooperated in the cleanup. *See* TEX. HEALTH & SAFETY CODE ANN. § 361.343(a)(1)—(4); *see also Burrow,* 997 S.W.2d at 245–46. However, other factors such as giving a party credit for cleanup expenditures approved by the TNRCC and reducing "in an equitable and just manner" the party's proportionate share of the costs it voluntarily expended, are legal determinations for the trial judge to make.

*See* Tex. Health & Safety Code Ann. § 361.343(b).

■ In this case, Street vehemently contests whether a causation-like relationship exists between any act of Street at Pilgrim's facilities and the remedial activities required at the sites. Street also contests the amount of waste attributable to it at the sites. These factual disputes should have been determined by the jury before the trial court apportioned damages in this case. Thus, we hold that the trial court erred in failing to submit these issues to the jury and that the error probably did cause the rendition of an improper judgment. *See* Tex.R.App. P. 44.1(a)(1).

### 9. Conclusion Regarding Street's Appeal

Because we hold that Street is a "person responsible for solid waste" (i.e., an arranger) under SWDA, we overrule Street's issue two. We sustain Street's first issue because we hold that the trial court erred in failing to allow the jury to make factual determinations regarding (1) whether a relationship exists between the PCE-wastes that Street arranged to be disposed of at Pilgrim's facilities and the remedial actions engaged in at the sites, and (2) the volume of the wastes at the sites attributable to Street.

### 10. Disposition: Rendition or Remand?

■ On appeal, Street argues that the correct remedy with regard to Pilgrim's SWDA claim is rendition of judgment in Street's favor, not remand for new trial. Street contends that Pilgrim waived its right to recover under SWDA by failing to submit or request any jury findings on that theory of recovery. We disagree.

At trial, Pilgrim argued that its SWDA claim should be decided as a matter of law by the trial court, while Street argued that issues of fact existed, which should be determined by the jury. At the charge conference, the following discussion took place regarding this issue:

> [STREET'S ATTORNEY]: We still have the issue of solid waste disposal.
>
> THE COURT: What about the issue of the solid waste disposal?
>
> [STREET'S ATTORNEY]: I thought your ruling was we were going to submit persons responsible to the jury.
>
> [PILGRIM'S ATTORNEY]: We say it's a question of law entirely. But if the court wants—
>
> THE COURT: I think it's a question of law, too.

Consistent with the trial court's ruling, Pilgrim did not submit proposed jury questions on its SWDA claim. However, *Street* submitted proposed jury questions and instructions for Pilgrim's SWDA claim, and also filed a written objection to the trial court's jury charge on the basis that the court failed to submit that theory of recovery to the jury.

■ In essence, Street contends that even though the trial ruled that it would determine Pilgrim's SWDA claim as a matter of law, Pilgrim was still required to request jury findings on this theory. In support of its argument that Pilgrim waived its right to recovery under SWDA, Street relies on Texas Rule of Civil Procedure 279 for the proposition that: "Upon appeal all independent grounds of recovery ... not conclusively established under the evidence and no element of which is submitted or requested are waived." *See* Tex.R. Civ. P. 279. The general rule is that the plaintiff has the burden to obtain affirmative answers to jury questions as to the necessary elements of his cause of action. *Id.; Southwestern Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493, 495 (Tex.1991).

However, we conclude that in cases in which the trial court has ruled that a theory is to be determined as a matter of law and takes it from the jury, a party will not be found to have waived that theory of recovery when it relies on that ruling and fails to request jury findings. Similarly, Texas courts have found no waiver in cases in which a party failed to submit jury issues after the trial court granted a directed verdict and withdrew the case from the jury. *See Clark v. Lone Star Life Ins. Co.*, 347 S.W.2d 290, 292 (Tex.Civ.App.—Waco 1961, writ ref'd n.r.e.) (concluding that predecessor to current Rule 279 did not apply in case in which trial court granted directed verdict and withdrew case from jury); *Sears, Roebuck & Co. v. Kengla*, 266 S.W.2d 548, 549 (Tex.Civ.App.—El Paso 1954, writ ref'd n.r.e.) (ordering new trial in case in which trial court erroneously withdrew negligence question from jury and found fact that defendant requested no such jury issue was immaterial); *City of Breckenridge v. Stoker*, 264 S.W.2d 511, 518 (Tex.Civ.App.—Eastland 1954, writ ref'd n.r.e) (finding plaintiffs did not waive claim for damages because trial court had directed verdict for the plaintiffs and withdrew case from jury).[24] We will not penalize Pilgrim for failing to submit jury questions on its SWDA claim when the trial court expressly ruled that it would withdraw the issue from the jury. Thus, remand is the appropriate remedy. *See* TEX.R.APP. P. 43.

Accordingly, we reverse that portion of the judgment awarding Pilgrim damages and interest on its Solid Waste Disposal Act claim and remand that claim to the trial court (1) for the jury to make factual determinations relating to (i) whether a relationship exists between the PCE-wastes, which Street arranged to be disposed of by Street at Pilgrim's facilities, and the remedial activities engaged in at the sites, and (ii) the volume of the wastes disposed of by Street at the sites; and (2) for the trial judge to determine the amount of damages (and interest) Pilgrim is entitled to from Street by apportioning the cleanup costs among the responsible parties based on the criteria listed in Solid Waste Disposal Act section 361.343.[25] We affirm the judgment in all other respects.

The discussion of Pilgrim's and Turk's appeal does not meet the criteria for publication, TEX.R.APP. P. 47, and is thus ordered not published.

24. Although the language of Rule 279 changed when the rule was amended in 1988, we find the reasoning of these cases persuasive. *See* TEX R. CIV. P. 279, 136 Tex. 526–27 (1941, amended 1988).

25. Rules of appellate procedure do not permit remand for a separate trial on unliquidated damages when liability is contested; however, good cause exists in this case to support a suspension of the rule. *See* TEX.R.APP. P. 44.1(b); *see also id.* 2 (stating appellate court may suspend rule's operation in particular case and order different procedure). Because the issues relating to Street's SWDA liability were properly decided as a matter of law, and the trial judge determines the ultimate award of damages, this is not a case that presents a risk of confusion for the jury. The interests of justice warrant a new trial on the issue of damages alone under these novel circumstances. *See Browning Oil Co. v. Luecke*, 38 S.W.3d 625, 647 n. 31 (Tex.App.—Austin 2000, pet. filed) (holding damages issue alone can be remanded because trial was bifurcated—bench trial on liability and jury trial on damages; thus, remanding damages alone will not cause jury confusion).